IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-121

No. 413PA21

Filed 16 December 2022

REBECCA HARPER; AMY CLARE OSEROFF; DONALD RUMPH; JOHN ANTHONY BALLA; RICHARD R. CREWS; LILY NICOLE QUICK; GETTYS COHEN, JR.; SHAWN RUSH; JACKSON THOMAS DUNN, JR.; MARK S. PETERS; KATHLEEN BARNES; VIRGINIA WALTERS BRIEN; and DAVID DWIGHT BROWN

v.

REPRESENTATIVE DESTIN HALL, in his official capacity as Chair of the House Standing Committee on Redistricting; SENATOR WARREN DANIEL, in his official capacity as Co-Chair of the Senate Standing Committee on Redistricting and Elections; SENATOR RALPH HISE, in his official capacity as Co-Chair of the Senate Standing Committee on Redistricting and Elections; SENATOR PAUL NEWTON, in his official capacity as Co-Chair of the Senate Standing Committee on Redistricting and Elections; SPEAKER OF THE NORTH CAROLINA HOUSE OF REPRESENTATIVES, TIMOTHY K. MOORE; PRESIDENT PRO TEMPORE OF THE NORTH CAROLINA SENATE, PHILIP E. BERGER; THE NORTH CAROLINA STATE BOARD OF ELECTIONS; and DAMON CIRCOSTA, in his official capacity

NORTH CAROLINA LEAGUE OF CONSERVATION VOTERS, INC.; HENRY M. MICHAUX, JR.; DANDRIELLE LEWIS; TIMOTHY CHARTIER; TALIA FERNÓS; KATHERINE NEWHALL; R. JASON PARSLEY; EDNA SCOTT; ROBERTA SCOTT; YVETTE ROBERTS; JEREANN KING JOHNSON; REVEREND REGINALD WELLS; YARBROUGH WILLIAMS, JR.; REVEREND DELORIS L. JERMAN; VIOLA RYALS FIGUEROA; and COSMOS GEORGE

v.

REPRESENTATIVE DESTIN HALL, in his official capacity as Chair of the House Standing Committee on Redistricting; SENATOR WARREN DANIEL, in his official capacity as Co-Chair of the Senate Standing Committee on Redistricting and Elections; SENATOR RALPH E. HISE, JR., in his official capacity as Co-Chair of the Senate Standing Committee on Redistricting and Elections; SENATOR PAUL NEWTON, in his official capacity as Co-Chair of the Senate Standing

Committee on Redistricting and Elections; REPRESENTATIVE TIMOTHY K. MOORE, in his official capacity as Speaker of the North Carolina House of Representatives; SENATOR PHILIP E. BERGER, in his official capacity as President Pro Tempore of the North Carolina Senate; THE STATE OF NORTH CAROLINA; THE NORTH CAROLINA STATE BOARD OF ELECTIONS; DAMON CIRCOSTA, in his official capacity as Chairman of the North Carolina State Board of Elections; STELLA ANDERSON, in her official capacity as Secretary of the North Carolina State Board of Elections; JEFF CARMON III, in his official capacity as Member of the North Carolina State Board of Elections; STACY EGGERS IV, in his official capacity as Member of the North Carolina State Board of Elections; TOMMY TUCKER, in his official capacity as Member of the North Carolina State Board of Elections; and KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections

Appeal pursuant to N.C.G.S. § 7A-27(b)(1) from the unanimous decision of a three-judge panel entered on 23 February 2022 in the Superior Court, Wake County, approving Legislative Defendants' Remedial House and Senate Plans, rejecting their Remedial Congressional Plan, and adopting a Modified Remedial Congressional Plan. Heard in the Historic 1767 Chowan County Courthouse on 4 October 2022.

*Patterson Harkavy LLP, by Burton Craige, Narendra K. Ghosh, and Paul E. Smith; Elias Law Group LLP, by Lalitha D. Madduri, Jacob D. Shelly, Graham W. White, and Abha Khanna; and Arnold & Porter Kaye Scholer LLP, by Elisabeth S. Theodore, R. Stanton Jones, and Samuel F. Callahan, for Harper Plaintiffs.*

*Robinson, Bradshaw & Hinson, P.A., by John R. Wester, Adam K. Doerr, Stephen D. Feldman, and Erik R. Zimmerman; and Jenner & Block LLP, by Sam Hirsch, Jessica Ring Amunson, Karthik K. Reddy, and Urja Mittal, for Plaintiff North Carolina League of Conservation Voters.*

*Southern Coalition for Social Justice, by Allison J. Riggs, Hilary H. Klein, Mitchell Brown, Katelin Kaiser, Jeffrey Loperfido, and Noor Taj; and Hogel Lovells US LLP, by J. Tom Boer and Olivia T. Molodanof, for Plaintiff Common Cause.*

*Nelson Mullins Riley & Scarborough LLP, by Phillip J. Strach, Thomas A. Farr, John Branch, and Alyssa M. Riggins; and Baker & Hostetler LLP, by E. Mark Braden and Katherine L. McKnight, for Legislative Defendants.*

*North Carolina Department of Justice, by Amar Majmundar, Senior Deputy Attorney General, Terence Steed, Special Deputy Attorney General, Mary Carla Babb, Special Deputy Attorney General, and Stephanie Brennan, Special Deputy Attorney General, for State Defendants.*

HUDSON, Justice.

¶ 1 The foundational democratic principles of equality and popular sovereignty enshrined in our Constitution's Declaration of Rights vest in the people of this state the fundamental right to vote on equal terms. N.C. Const. art. I, §§ 1 (equality and rights of persons), 2 (sovereignty of the people), 10 (free elections), 12 (freedom of assembly), 14 (freedom of speech), 19 (equal protection of the laws); *see Harper v. Hall,* 380 N.C. 317, 2022-NCSC-17, ¶ 158–59 (summarizing these principles and rights). This fundamental right "encompasses the opportunity to aggregate one's vote with likeminded citizens to elect a governing majority of elected officials who reflect those citizens' views." *Harper,* ¶ 160. Put differently, it requires that "voters of all political parties [have] substantially equal opportunity to translate votes into seats." *Id.* ¶ 163. Therefore, when a districting plan systematically makes it harder for individuals of one political party to elect a governing majority than individuals of

another party of equal size based upon that partisanship, it deprives a voter of his or her fundamental right to equal voting power. *Id.* "[S]uch a plan is subject to strict scrutiny and is unconstitutional unless the General Assembly can demonstrate that the plan is 'narrowly tailored to advance a compelling governmental interest.' " *Id.* ¶ 161 (citing *Stephenson v. Bartlett*, 355 N.C. 354, 377 (2002)).

¶ 2 In accordance with these principles, on 4 February 2022, this Court struck down the General Assembly's 2021 Congressional Map, State Senate Map, and State House Map as unconstitutional partisan gerrymanders that failed strict scrutiny. *See generally Harper*, 2022-NCSC-17. In doing so, we noted a few potential statistical measures that could be used by the General Assembly and reviewing courts in determining whether redistricting plans demonstrate "a significant likelihood . . . [of] giv[ing] the voters of all political parties substantially equal opportunity to translate votes into seats across the plan." *Id.* ¶ 163. However, we expressly declined to "identify an exhaustive set of metrics or precise mathematical thresholds which conclusively demonstrate or disprove the existence of an unconstitutional partisan gerrymander." *Id.* Rather than relying on certain measures dispositively, we emphasized that ultimately "[w]hat matters here . . . is that each voter's vote carries roughly the same weight when drawing a redistricting plan that translates votes into seats in a legislative body." *Id.* 169.

¶ 3 This was neither accident nor oversight. An individual statistical measure

standing alone, though helpful, is not dispositive of constitutional compliance. Rather, it constitutes one datapoint within a broader constellation of principles that a court may consider in reaching its ultimate constitutional determination: whether the proposed maps uphold or violate the fundamental right of all voters to vote on equal terms. *Id.* ¶¶ 163–69.

¶ 4 After determining that the 2021 Maps failed strict scrutiny, this Court gave the General Assembly the opportunity to submit remedial maps in accordance with N.C.G.S. § 120-2.4(a). *Id.* ¶ 178. We remanded the case to the trial court to oversee and assess the constitutionality of those remedial maps. *Id.* ¶ 223.

¶ 5 On 23 February 2022, the trial court issued its remedial order assessing the General Assembly's remedial maps. Therein, the trial court rejected the General Assembly's Remedial Congressional Plan but approved its Remedial House Plan and Remedial Senate Plan. The parties appealed each of these rulings to this Court.

¶ 6 Now, this Court must review the alignment of the trial court's remedial order with the foundational principles established in *Harper*. We determine that the trial court properly concluded that the Remedial Congressional Plan fell short of constitutional standards and that the Remedial House Plan met constitutional standards. These conclusions of law were supported by adequate factual findings, which were in turn supported by competent evidence. However, we hold that the trial court erred in its approval of the Remedial Senate Plan. Unlike the trial court's

conclusions regarding the other plans, the trial court's conclusion of law regarding the Remedial Senate Plan lacked adequate factual findings supported by competent evidence. Indeed, the evidence dictates the opposite finding and conclusion. Therefore, we affirm the trial court's rejection of the Remedial Congressional Plan, affirm the trial court's approval of the Remedial House Plan, and reverse the trial court's approval of the Remedial Senate Plan.

¶ 7 In accordance N.C.G.S. § 120-2.4(a1), we now remand this case to the trial court to oversee the creation and adoption of a Modified Remedial Senate Plan that modifies Legislative Defendants' Remedial Senate Plan only to the extent necessary to achieve constitutional compliance. *See* N.C.G.S. § 120-2.4(a1) (2021).

¶ 8 In so doing, we expressly and emphatically reaffirm the fundamental right of citizens to vote on equal terms enshrined within our Constitution's Declaration of Rights, and this Court's constitutional responsibility and authority to assess legislative compliance therewith. *See Corum v. Univ. of N.C.*, 330 N.C. 761, 783 (1992) ("It is the state judiciary that has the responsibility to protect the state constitutional rights of the citizens; this obligation to protect the fundamental rights of individuals is as old as the State."). These principles are—and must remain—the enduring bedrock of our sacred system of democratic governance, and may be neither subordinated nor subverted for the sake of passing political expediency.

## I.    Factual and Procedural Background

A complete factual and procedural background of the liability phase of this litigation can be found in *Harper*, ¶¶ 12–93. Here, we briefly restate that background and summarize the subsequent remedial proceedings leading to the present appeal.

### A.  Liability Phase: 2021 Maps and *Harper I*

Every ten years, following the national census, the General Assembly is tasked with redrawing North Carolina's congressional and state legislative districts. *See* U.S. Const. art. I, § 4; N.C. Const. art. II, §§ 3, 5. Accordingly, on 4 November 2021, the General Assembly enacted new maps for North Carolina's congressional districts and state House of Representatives and Senate districts (2021 Maps). S.L. 2021-174, S.L. 2021-175, S.L. 2021-173; *see Harper,* 2022-NCSC-17, ¶¶ 14–18 (describing the 2021 redistricting process).

On 16 and 18 November 2021, NCLCV Plaintiffs[1] and Harper Plaintiffs[2] respectively filed complaints against Legislative Defendants challenging the

---

[1] NCLCV Plaintiffs include the North Carolina League of Conservation Voters, Inc., Henry M. Michaux Jr., Dandrielle Lewis, Timothy Chartier, Talia Fernos, Katherine Newhall, R. Jason Parsley, Edna Scott, Roberta Scott, Yvette Roberts, Jereann King Johnson, Reverend Reginal Wells, Yarbrough Williams Jr., Reverend Deloris L. Jerman, Viola Ryals Figueroa, and Cosmos George.

[2] Harper Plaintiffs include Rebecca Harper, Amy Clare Oseroff, Donald Rumph, John Anthony Balla, Richard R. Crews, Lily Nicole Quick, Gettys Cohen Jr., Shawn Rush, Mark S. Peters, Kathleen Barnes, Virginia Walters Brien, Eileen Stephens, Barbara Proffitt, Mary Elizabeth Voss, Chenita Barber Johnson, Sarah Taber, Joshua Perry Brown, Laureen Floor, Donald M. MacKinnon, Ron Osborne, Ann Butzner, Sondra Stein, Bobby Jones, Kristiann Herring, and David Dwight Brown.

constitutionality of the 2021 Maps under the North Carolina Constitution. Specifically, Plaintiffs asserted that the 2021 Maps engaged in extreme partisan gerrymandering and racial vote dilution in violation of the Free Elections Clause, art. I, § 10, the Equal Protection Clause, art. I, § 19, and the Freedom of Speech and Assembly Clauses, art. I, §§ 12, 14. Plaintiffs sought a declaratory judgment, a permanent injunction against the use of the 2021 Maps, and the creation and implementation of new, constitutionally compliant maps.

Plaintiffs' cases were consolidated and assigned to a three-judge panel of the Superior Court, Wake County, pursuant to N.C.G.S. § 1-267.1 and Rule 42 of the North Carolina Rules of Civil Procedure.[3] On 15 December 2021, the trial court granted Plaintiff Common Cause's motion to intervene in the consolidated case. In response to Plaintiffs' claims, Legislative Defendants asserted, *inter alia*, that the only limitations on redistricting legislation are those expressly found in article II, sections 2, 3, 4, and 5 of the North Carolina Constitution, and that Plaintiffs' claims were nonjusticiable.

From late December 2021 to early January 2022, the trial court conducted an expedited and extensive discovery and trial process. Plaintiffs and Legislative Defendants submitted evidence from several expert witnesses and accompanying

---

[3] We take a moment of privilege to express the Court's gratitude to the panel for their diligent service to the state in this case: Judge A. Graham Shirley, Judge Nathaniel J. Poovey, and Judge Dawn M. Layton.

reports regarding the 2021 Maps.

¶ 14     On 11 January 2022, the trial court issued its final judgment. Therein, the trial court found that all three of the 2021 Maps indeed constituted extreme partisan outliers that were the product of intentional, pro-Republican redistricting at the subordination of traditional, neutral redistricting principles. However, the trial court concluded that claims of partisan gerrymandering present purely political questions that are nonjusticiable under the North Carolina Constitution. Accordingly, the trial court held that the 2021 Maps were not unconstitutional and denied Plaintiffs' requests for declaratory and injunctive relief. Plaintiffs appealed to this Court from the trial court's judgment.

¶ 15     In February 2022, this Court reversed.[4] *Harper*, ¶ 223. The Court concluded that partisan gerrymandering claims are justiciable under the North Carolina Constitution, that our Constitution's Declaration of Rights enshrines the fundamental right to vote on equal terms, and that the 2021 Maps violated that right. *Id.* ¶¶ 7, 94.

¶ 16     First, the Court addressed Plaintiffs' standing. *Id.* ¶ 95. The Court noted that in accordance with *Committee to Elect Dan Forest v. Employees Political Action Committee*, 376 N.C. 558, 2021-NCSC-6, "direct constitutional challenges to statutes

---

[4] On 4 February 2022, the Court issued a preliminary order. On 14 February 2022, the Court issued its subsequent full opinion.

-9-

or other acts of government . . . require only the requisite concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Harper*, ¶ 96 (cleaned up). Here, the Court determined that the parties' allegations of the violation of their legal rights, even if widely shared with others, were sufficient to show such concrete adverseness. *Id.* The Court thus concluded that each individual and organizational plaintiff met the requirements for legal standing under our Constitution. *Id.* ¶ 99.

Second, the Court addressed justiciability. *Id.* ¶ 100. The Court noted that "simply because the Supreme Court [of the United States] has concluded partisan gerrymandering claims are nonjusticiable in *federal* courts, it does not follow that they are nonjusticiable in North Carolina courts." *Id.* ¶ 110 (emphasis added) (citing *Rucho v. Common Cause*, 139 S. Ct. 2484, 2507 (2019)). Further, "the mere fact that responsibility for reapportionment is committed to the General Assembly does not mean that the General Assembly's decisions in carrying out its responsibility are fully immunized from any judicial review." *Id.* ¶ 115. Rather, the General Assembly's reapportionment power is subject to constitutional limitations, including compliance with the fundamental rights enshrined in the Declaration of Rights. *Id.* ¶ 119.

Then, the Court considered whether partisan gerrymandering violates those rights. *Id.* ¶ 121. After surveying the history of our Declaration of Rights generally, *id.* ¶¶ 122–32, the Court considered each pertinent clause in turn. First, the Court

concluded that partisan gerrymandering "is cognizable under the free elections clause because it can prevent elections from reflecting the will of the people impartially and . . . diminish[ ] or dilut[e] voting power on the basis of partisan affiliation." *Id.* ¶ 141; N.C. Const. art. I, § 10. Second, the Court concluded that partisan gerrymandering is cognizable under the equal protection clause because it "diminishes or dilutes a voter's opportunity to aggregate with likeminded voters to elect a governing majority[,]" thus "infring[ing] upon that voter's fundamental rights to vote on equal terms and to substantially equal voting power." *Id.* ¶ 150; N.C. Const. art. I, § 19. Third, the Court concluded that partisan gerrymandering is cognizable under the free speech and freedom of assembly clauses because it imposes a burden on the fundamental right to equal voting power based on political viewpoint. *Id.* ¶ 157.

¶ 19    The Court summarized the intersection of the Declaration of Rights and partisan gerrymandering, emphasizing that together, the fundamental principles of equality and popular sovereignty "reflect the democratic theory of our constitutional system: the principle of political equality." *Id.* ¶ 158. In order to realize this principle,

> the channeling of "political power" from the people to their representatives in government through the democratic processes envisioned by our constitutional system must be done on equal terms. If through state action the ruling party chokes off the channels of political change on an unequal basis, then government ceases to "derive[ ]" its power from the people or to be "founded upon their will only," and the principle of political equality that is fundamental to our Declaration of Rights and our constitutionally enacted represented system of government

is violated.

*Id.* Accordingly, "[t]o comply with the constitutional limitations contained in the Declaration of Rights which are applicable to redistricting plans, the General Assembly must not diminish or dilute on the basis of partisan affiliation any individual's vote." *Id.* ¶ 160. Therefore, "when a districting plan systematically makes it harder for individuals [of one party] to elect a governing majority than individuals in a favored party of equal size[,] the General Assembly deprives on the basis of partisan affiliation a voter of his or her right to equal voting power." *Id.* "[S]uch a plan is subject to strict scrutiny and is unconstitutional unless the General Assembly can demonstrate that the plan is narrowly tailored to advance a compelling governmental interest." *Id.* ¶ 161 (cleaned up).

¶ 20    The Court also noted various ways to measure partisan vote dilution. The Court explained that partisan vote dilution

> can be measured either by comparing the number of representatives that a group of voters of one partisan affiliation can plausibly elect with the number of representatives that a group of voters of the same size of another partisan affiliation can plausibly elect, or by comparing the relative chances of voters from each party electing a supermajority or majority of representatives under various possible electoral conditions.

*Id.* However, the Court did "not believe it prudent or necessary to . . . identify an exhaustive list of metrics or precise mathematical thresholds which conclusively demonstrate or disprove the existence of an unconstitutional partisan gerrymander."

*Id.* ¶ 163 Rather, the Court observed that

> as the trial court's findings of fact indicate[d], there are
> multiple reliable ways of demonstrating the existence of an
> unconstitutional partisan gerrymander. In particular,
> mean-median difference analysis; efficiency gap analysis;
> close-votes, close-seats analysis; and partisan symmetry
> analysis may be useful in assessing whether the mapmaker
> adhered to traditional neutral districting criteria and
> whether a meaningful partisan skew necessarily results
> from North Carolina's unique political geography. If some
> combination of these metrics demonstrates there is a
> significant likelihood that the districting plan will give the
> voters of all political parties substantially equal
> opportunity to translate votes into seats across the plan,
> then the plan is presumptively constitutional.

*Id.* While the Court identified "a mean-median difference of 1% or less" and an efficiency gap of 7% or less as potential "threshold[s] [for] a presumption of constitutionality . . . absent other evidence," we emphasized that ultimately "[w]hat matters here, as in the one-person, one-vote context, is that each voter's vote carries roughly the same weight when drawing a redistricting plan that translates votes into seats in a legislative body." *Id.* ¶¶ 166, 167, 169.

The Court then held that "[o]nce a plaintiff shows that a map infringes on their fundamental right to equal voting power . . . or that it imposes a burden on that right based on their views[,] . . . the map is subject to strict scrutiny and is presumptively unconstitutional." *Id.* ¶ 170. At that point, the government must demonstrate that the plan is nevertheless necessary to promote a compelling governmental interest. *Id.*

The Court then applied this constitutional standard to the 2021 Maps. *Id.* ¶¶

178–213. Based on the trial court's extensive factual findings, the Court determined that all three of the 2021 Maps constituted partisan gerrymanders in violation of the North Carolina Constitution's Declaration of Rights. *Id*. Because Legislative Defendants failed to show that the 2021 Maps were nevertheless narrowly tailored to a compelling governmental interest, the Court concluded that each of the plans failed strict scrutiny. *Id*. ¶¶ 195 (Congressional Map), 205 (State House Map), 213 (State Senate Map).

¶ 23 Finally, the Court addressed the General Assembly's compliance with *Stephenson* requirements regarding racially polarized voting. *Id*. ¶¶ 214–16. The Court concluded that compliance with article I, sections 3 and 5, and article II, sections 3 and 5 of our Constitution "requires the General Assembly to conduct racially polarized voting analysis within their decennial redistricting process in order to assess whether any steps must be taken to avoid the dilution of minority voting strength." *Id*. ¶ 216.

¶ 24 In compliance with N.C.G.S. § 120-2.4(a), the Court then remanded the case to the trial court "to oversee the redrawing of the maps by the General Assembly or, if necessary, by the court." *Id*. ¶ 223. In so doing, the Court ordered that "the General Assembly shall now have the opportunity to submit new congressional and state legislative districting plans that satisfy all provisions of the North Carolina Constitution." *Id*. The Court concluded by noting its "sincere hope . . . that these new

maps ensure that the channeling of 'political power' from the people to their representatives in government through elections . . . is done on equal terms so that ours is a 'government of right' that 'originates from the people' and speaks with their voice." *Id*.

**B. Remedial Phase: Remedial Plans and Trial Court's Remedial Order**

¶ 25 Thus began the remedial phase of this case. On 16 February 2022, the trial court issued an order appointing three former North Carolina jurists—Justice Robert F. Orr (ret.), Justice Robert H. Edmunds Jr. (ret.), and Judge Thomas W. Ross (ret.)—to serve as Special Masters.[5] The Special Masters' task was twofold. First, they assisted the trial court in reviewing the parties' proposed remedial plans via a written report. Second, they were to assist the trial court in developing an alternative, constitutionally compliant remedial plan in the event that the General Assembly's proposed remedial plan fell short.

¶ 26 To assist in these tasks, the Special Masters were authorized to hire advisors (Special Masters' Advisors). They hired Dr. Bernard Grofman, Dr. Tyler Jarvis, Dr. Eric McGhee, and Dr. Samuel Wang.

¶ 27 On 18 February 2022, Legislative Defendants timely submitted their Remedial Plans to the trial court. These included the Remedial Congressional Plan (RCP),

---

[5] We take a moment of privilege to express the Court's gratitude to the Special Masters for their diligent service to the state in this case.

Remedial House Plan (RHP), and Remedial Senate Plan (RSP).

On 21 February 2022, Legislative Defendants filed a motion to disqualify two of the Special Masters' Advisors, Dr. Wang and Dr. Jarvis, because they had engaged in prohibited ex parte communications with Plaintiffs' experts.

On 21 February 2022, Plaintiffs timely submitted their comments and objections to Legislative Defendants' Remedial Plans. NCLCV Plaintiffs objected to the RCP and RSP. NCLCV Plaintiffs did not specifically object to the RHP, but instead requested that the trial court conduct its own analysis of the RHP. Harper Plaintiffs objected to the RCP and RSP but did not object to the RHP. Plaintiff Common Cause generally objected to all three Remedial Plans, and specifically contended that House District 10 of the RHP and Senate District 4 of the RSP must be redrawn.

Thereafter, the Special Masters' Advisors submitted their analysis of each of the proposed remedial plans. Because this analysis served as the foundational evidence for the Special Masters' and trial court's subsequent findings of fact, we briefly summarize this evidence here.

***RCP Analysis***. Dr. Grofman determined that the RCP "creates a distribution of voting strength across districts that is very lopsidedly Republican." He determined that "[b]ecause they all point in the same direction, the political effects statistical indicators of partisan gerrymandering strongly suggest the conclusion that this

congressional map should be viewed as a pro-Republican gerrymander." He determined that the RCP yielded an efficiency gap of 6.37% but noted that that this was "not . . . proof that there is no vote dilution" because, based on other measures, "legislative map drawers have apparently sought to draw a congressional map that just narrowly pass[es] a supposed threshold test for partisan gerrymandering."

¶ 32    Dr. McGhee determined that the RCP yielded an efficiency gap of 6.4%, a mean-median difference of 1.1%, a partisan asymmetry of 4.9%, and a declination metric of 0.14, all favoring Republicans. He noted that "[t]he values with incumbency factored in all lean more Republican . . . , and this incumbency effect is greater than it was in the [2021] enacted plan." Relatively, he noted that while the RCP shows improvement from the 2021 enacted plan on several measures of partisan symmetry, it is "clearly worse" than the remedial congressional plans proposed by Plaintiffs.

¶ 33    Dr. Wang determined that the RCP yields an average efficiency gap of 6.8% and an average mean-median difference of 1.2%, both favoring Republicans. He determined that in nine out of ten sample elections, "Republicans won more seats than the Democrats with the same vote share." "Averaging across all 10 elections, the advantage was 1.7 more seats for Republicans, or 12% of the 14-seat Congressional delegation."

¶ 34    Finally, Dr. Jarvis determined that the RCP "consistently favors Republicans" across all applicable measures. He determined that the RCP yields an efficiency gap

of 8.8%, a mean-median difference of 0.9%, a partisan bias of 5.2%, and a declination metric of 11.6%, all favoring Republicans.

¶ 35    ***RHP Analysis***. Dr. Grofman determined that although the RHP "creates a distribution of voting strength across districts that is very lopsidedly Republican," it "is genuinely far more competitive than either of the other two legislatively proposed maps." He observed that under the RHP, "unlike the other maps, the Democrats do not have to win all of the competitive seats to win a majority in the House. Moreover, unlike the [RCP and RSP], . . . the competitive seats [in the RHP] are substantially Democrat in directionality." He further noted that

> quit[e] important in judging the constitutionality of this map in the full context are the facts that: (a) the Harper plaintiffs have not chosen to offer an alternative [RHP] but are apparently content to see the legislative map implemented by the Court, (b) the map was passed by a clear bipartisan consensus in the legislature, including members of the legislature who belong to particular minority communities, and (c) that while it still is further from being non-dilutive than the NCLCV [RHP] alternative, it is far closer to Plaintiffs' map than it is to the rejected [2021] enacted NC House map.

He determined that while the RHP's efficiency gap "remains in a pro-Republican direction," it is "at the low level of 2.72[%]." In considering "the totality of the circumstances . . . and recognizing that this map is still not ideal (nor need it be)," he concluded that the RHP "simply lacks the same clear indicia of egregious bias found in the previously rejected maps and still found . . . in the [RCP] and [RSP]."

¶ 36        Dr. McGhee likewise determined that the RHP "still favors Republicans when all seats are open, but substantially less [than the 2021 congressional map]." He determined that the RHP yields an efficiency gap of 3.0%, a mean-median difference of 1.4%, a partisan asymmetry of 2.9%, and a declination metric of 0.16, all favoring Republicans. Dr. McGhee concluded that the RHP "still favors Republicans: the party would likely hold about 64 of 120 seats with half the vote, and it would take the Democrats somewhere close to 52% of the vote to bring that number down to 60." Relatively, he determined that the RHP "is very similar to" NCLCV Plaintiffs' proposed remedial house map on metrics of partisan symmetry, that it "do[es] a reasonably good job of respecting traditional geographic principles," and that it reflects "very similar compactness" as Plaintiffs' proposed remedial House map. He concluded that the RHP's partisan symmetry is "closer [to NCLCV's proposed remedial plan] than was the case for either the [RSP] or the [RCP]," noting that the NCLCV Plaintiffs' plan is only "a little better." He concluded that this "relatively marginal improvement hints that it may be difficult to do better while still abiding by other constraints."

¶ 37        Dr. Wang determined that the RHP favors Republicans in all six metrics evaluated: seat partisan asymmetry, mean-median difference, partisan bias, lopsided wins, declination angle, and efficiency gap. Specifically, he determined that the RHP yielded an efficiency gap of 3.1%, a mean-median difference of 0.9%, a partisan

asymmetry of 7.2 seats, and a declination angle of 4.5 degrees.

¶ 38       Finally, Dr. Jarvis determined that the RHP "appear[s] to be mostly typical in terms of the number of seats won." He determined that the RHP yields an efficiency gap of 2.7%, a mean-median difference of 1.5%, an average partisan bias of 2.7%, and a declination metric of 5.7%.

¶ 39       ***RSP Analysis***. Dr. Grofman determined that the RSP "creates a distribution of voting strength across districts that is very lopsidedly Republican." He determined the RSP's vote bias indicates "a <u>substantial</u> pro-Republican bias" in which a statewide majority of Republican voters would be able to win a majority of the seats while "only a win by considerably more than 50% of the statewide vote can yield the Democrats a majority of the seats." He determined that "[b]ecause they all point in the same direction, the political effects statistical indicators of partisan gerrymandering argue for the conclusion that th[e] [RSP] should be viewed as a pro-Republican gerrymander." He concluded that "the dilutive effects of th[e] RSP] . . . are still . . . quite substantial."

¶ 40       Dr. McGhee determined that the RSP "still favors Republicans when all seats are open." He concluded that the RSP yields an efficiency gap of 4.8%, a mean-median difference of 2.2%, a partisan asymmetry of 4.8%, and a declination metric of 0.20, all favoring Republicans. He observed that "[t]he [efficiency gap] value now clearly falls below the commonly identified threshold of 7%, though the [mean-median difference]

value falls well above the 1% number cited by Legislative Defendants." He determined that "[a]ll the metric values for both the open seat and incumbency scenarios are more than 50% likely to favor Republicans throughout the decade." He concluded that

> the [mean-median difference] and [partisan symmetry] metrics, which are more relevant for a state legislative plan because they connect directly to control of the chamber, suggest that in a tied election Republicans would still hold 27 or 28 [of 50 total] seats, and that Democrats would need to win as much as 53 percent of the vote to claim 25 seats. The odds are about three to one that Republicans would maintain this advantage throughout the decade.

Relatively, Dr. McGhee observed that the Republican advantage within Plaintiffs' proposed RSP "is often less than half the size of the same advantage in the Legislative Defendants' [RSP]." "This suggests that there is nothing foreordained about the advantages in the Legislative Defendants' plan."

¶ 41        Dr. Wang determined that the RSP favors Republicans in all six metrics evaluated: seat partisan asymmetry, mean-median difference, partisan bias, lopsided wins, declination angle, and efficiency gap. Specifically, he determined that the RSP yields an efficiency gap of 2.2%, a mean-median difference of 0.8%, and an average partisan asymmetry of 2.1 seats, all favoring Republicans.

¶ 42        Finally, Dr. Jarvis determined that analysis of the RSP reveals that it "is often a significant outlier in favor of the Republicans." He determined that the RSP yields an efficiency gap of 4.0%, a mean-median difference of 1.4%, an average partisan bias

of 4.0%, and a declination metric of 7.0%.

¶ 43    Based upon this evidence, the Special Masters submitted their report to the trial court on 23 February 2022 (Special Masters' Report). As an initial matter, the Special Masters addressed Legislative Defendants' motion to disqualify Drs. Wang and Jarvis. While the Special Masters "acknowledge[d] the technical breach of th[e] [c]ourt's mandate that no *ex parte* communication occur between parties and non-parties," they "respectfully recommend[ed] that the [c]ourt deny the motion." Denial was proper, the Special Masters contended, because: (1) the communications were not made in bad faith; (2) the communications were solely for the purpose of proceeding as quickly as possible; (3) the information sought was all publicly available; and (4) the analysis provided by Drs. Wang and Jarvis, though helpful, was not determinative in any of the Special Masters' recommendations.

¶ 44    Next, the Special Masters recommended that the trial court approve the RHP and RSP but reject the RCP.

¶ 45    Regarding the RHP, the Special Masters' Report stated as follows:

> The advisors as well as the experts of the parties ("experts") all found the efficiency gap of the proposed [RHP] to be less than 7%. The majority of the advisors and experts found the mean-median difference of the proposed [RHP] to be less than 1%. In addition to these facts, the Special Masters considered the findings of the advisors on the partisan symmetry analysis, the declination metrics, and their opinions on partisan bias and evidence of partisan gerrymandering. Considering all of this information as well as the totality of the circumstances, the Special

Masters conclude under the metrics identified by the North Carolina Supreme Court that the proposed [RHP] meets the test of presumptive constitutionality. Further the Special Masters did not find substantial evidence to overcome the presumption of constitutionality and recommend to the trial court that it give appropriate deference to the General Assembly and uphold the constitutionality of the [RHP].

¶ 46   Similarly, regarding the RSP, the Special Masters' Report stated as follows:

All of advisors and experts found the efficiency gap of the proposed [RSP] to be less than 7%. The majority of the advisors and experts found the mean-median difference of the proposed [RSP] to be less than 1%. In addition to these facts, the Special Masters considered the findings of the advisors on the partisan symmetry analysis, the declination metrics, and their opinions on partisan bias and evidence of partisan gerrymandering. Considering all of this information as well as the totality of the circumstances, the Special Masters conclude under the metrics identified by the North Carolina Supreme Court [that] the [RSP] meets the test of presumptive constitutionality. Further the Special Masters did not find substantial evidence to overcome the presumption of constitutionality and recommend to the trial court that it give appropriate deference to the General Assembly and uphold the constitutionality of the [RSP].

¶ 47   Regarding the RCP, however, the Special Masters' Report stated as follows:

Unlike the proposed [RHP] and [RSP], there is substantial evidence from the findings of the advisors that the proposed congressional plan has an efficiency gap above 7% and a mean-median difference of greater than 1%. The Special Masters considered this evidence along with the advisors' findings on the partisan symmetry analysis and the declination metrics. There is disagreement among the parties as to whether the proposed [RCP] meets the presumptively constitutional thresholds suggested by the

Supreme Court. The Special Masters, considering the reports of their advisors and the experts of the parties while giving appropriate deference to the General Assembly, are of the opinion that the proposed [RCP] fails to meet the threshold of constitutionality and recommend that the [t]rial [c]ourt reject the proposed [RCP] as being unconstitutional.

¶ 48    As instructed, the Special Masters therefore submitted to the trial court "a modified version of the proposed [RCP] submitted by Legislative Defendants." (Modified RCP). The Report stated that "[i]t is [the Special Masters'] opinion that the [Modified RCP] satisfies the requirements of the Supreme Court." Specifically, the Special Masters noted that because

> the Constitution of North Carolina provides that the General Assembly has the responsibility of redistricting, [they] focused on the [RCP] submitted by the Legislative Defendants. On that basis, the Special Masters worked solely with [Advisor] Dr. Bernard Grofman and his assistant to amend the Legislative Defendants' plan to enhance its consistency with the opinion of the Supreme Court of North Carolina, the Constitutions of the United States and of North Carolina, and the expressed will of the General Assembly.

The Special Masters then determined that

> the [M]odified [RCP] recommended for adoption to the [t]rial [c]ourt achieves the partisan fairness and "substantially equal voting power" required by the Supreme Court of North Carolina without diluting votes under the Voting Rights Act while maintaining the number of county splits, retaining equal populations, compactness, and contiguity, as well as respecting municipal boundaries. Dr. Grofman's analysis of the [M]odified [RCP] recommended by the Special Masters indicates that the

plan has an efficiency gap of 0.63%, a mean-median difference of 0.69%, seat bias of 0.28%, and vote bias of 0.10%. According to Dr. Grofman, "this is the most non-dilutive plan in partisan terms of any map that has been submitted to the [c]ourt."

Accordingly, the Special Masters recommend[ed] to the [t]rial [c]ourt that it order the State of North Carolina to utilize the [M]odified [RCP] prepared by the Special Masters in the 2022 Congressional election.

¶ 49 On 23 February 2022, the trial court issued its subsequent remedial order. In alignment with the recommendations of the Special Masters, the trial court approved Legislative Defendants' RHP and RSP but rejected their RCP and implemented the Special Masters' Modified RCP.

¶ 50 First, the trial court summarized the General Assembly's remedial process. The trial court noted that in addition to the traditional neutral redistricting criteria considered in the creation of the 2021 Maps, the General Assembly intentionally used partisan election data in the creation of the Remedial Plans in compliance with this Court's remedial order. The trial court further noted that "[t]he General Assembly conducted an abbreviated racially polarized voting ("RPV") analysis to determine whether racially polarized voting is legally sufficient in any area of the state such that Section 2 of the Voting Rights Act *requires* the drawing of a district to avoid diluting the voting strength of African American voters during the remedial process." The trial court subsequently found "that the General Assembly satisfied the directive in the Supreme Court Remedial Order to determine whether the drawing of a district

in an area of the state is required to comply with Section 2 of the Voting Rights Act."

¶ 51　　　　The trial court then summarized the Special Masters' Report. The trial court found that while "[t]he Special Masters' findings demonstrate that the [RHP] and [RSP] meet the requirements of the Supreme Court's Remedial Order and full opinion[,] . . . [t]he Special Masters' findings demonstrate that the [RCP] does not meet [those] requirements." The trial court then "adopt[ed] in full the findings of the Special Masters."

¶ 52　　　　The trial court went on to review each of Legislative Defendants' Remedial Plans. First, the court assessed the RCP. The trial court observed that the RCP passed both chambers of the General Assembly by a strict party-line vote, with Republicans voting for and Democrats voting against. Assessing the partisanship of the RCP, the trial court observed that "[t]he Supreme Court Remedial Order stated that a combination of different methods could be used to evaluate the partisan fairness of a districting plan; of those methods, the General Assembly used the 'mean-median' test and the 'efficiency gap' test to analyze the partisan fairness of the Remedial Plans." The trial court then found, based upon "the analysis performed by the Special Masters and their advisors, that the [RCP] is not satisfactorily within the statistical ranges set forth in the Supreme Court's full opinion. *See Harper v. Hall*, 2022-NCSC-17, ¶ 166 (mean-median difference of 1% or less) and ¶ 167 (efficiency gap less than 7%)." The trial court further determined "that the partisan skew in the

[RCP] is not explained by the political geography of North Carolina."

Second, the trial court addressed the RSP. The court noted that the plan passed both chambers of the General Assembly by a strict party-line vote, with Republicans voting for and Democrats voting against. The court subsequently found, based upon "the analysis performed by the Special Masters and their advisors, that the [RSP] is satisfactorily within the statistical ranges set forth in the Supreme Court's full opinion. *See Harper v. Hall*, 2022-NCSC-17, ¶ 166 (mean-median difference of 1% or less) and ¶ 167 (efficiency gap less than 7%)." The court found that "to the extent there remains a partisan skew in the [RSP], that partisan skew is explained by the political geography of North Carolina." The court determined that "the measures taken by the General Assembly for the purposes of incumbency protection in the [RSP] are consistent with the equal voting power requirements of the North Carolina Constitution" and that "the General Assembly did not subordinate traditional neutral districting criteria to partisan criteria or considerations in the [RSP]."

Third, the trial court addressed the RHP. The court noted that six amendments to the plan were offered by Democratic Representatives and passed, and the RHP then proceeded to pass the House by a vote of 115-5 and pass the Senate by a vote of 41-3. The court observed that "[t]he 'aye' votes in the House and Senate were by members of both political parties[,]" while "[t]he 'no' votes in the House and Senate were solely by members of the Democratic Party." Regarding the RHP's use of

partisanship, the court found, based upon and confirmed by "the analysis performed by the Special Masters and their advisors, that the [RHP] [is] satisfactorily within the statistical ranges set forth in the Supreme Court's full opinion. *See Harper v. Hall*, 2022-NCSC-17, ¶ 166 (mean-median difference of 1% or less) and ¶ 167 (efficiency gap less than 7%)." The court found that "to the extent there remains a partisan skew in the [RHP], that partisan skew is explained by the political geography of North Carolina." The court determined that "the measures taken by the General Assembly for the purposes of incumbency protection in the [RHP] are consistent with the equal voting power requirements of the North Carolina Constitution" and that "the General Assembly did not subordinate traditional neutral districting criteria to partisan criteria or considerations in the [RHP]."

¶ 55        Next, the trial court considered the proposed alternative remedial plans. Because the court was "satisfied with the [RHP] and [RSP], [it] did not need to consider an alternative plan" for those maps. In accordance with N.C.G.S. § 120-2.4(a1), the trial court ordered the use of the Special Masters' "interim districting plan for the 2022 North Carolina Congressional election that differs from the [RCP] to the extent necessary to remedy the defects identified by the [c]ourt." The trial court determined that the Modified RCP "was developed in an appropriate fashion, is consistent with N.C.G.S. § 120-2.4(a1), and is consistent with the North Carolina Constitution and the Supreme Court's full opinion." (Footnote omitted).

¶ 56 Based on these factual findings, the trial court then reached its legal conclusions. First, the trial court noted this Court's ruling in *Harper* that "there are multiple reliable ways of demonstrating the existence of an unconstitutional partisan gerrymander" and that "[i]f some combination of these metrics demonstrates there is a significant likelihood that the districting plan will give the voters of all political parties substantially equal opportunity to translate votes into seats across the plan, then the plan is presumptively constitutional." *Harper*, ¶ 163.

¶ 57 The trial court then specified its legal conclusions regarding the Remedial Plans. The trial court concluded that the RSP and RHP "satisf[y] the Supreme Court's standards" and therefore concluded that the RHP and RSP "are presumptively constitutional." The trial court concluded that "no evidence presented to the [c]ourt is sufficient to overcome this presumption for the [RSP] and [RHP], and those plans are therefore constitutional and will be approved.

¶ 58 However, the trial court "conclude[d] that the [RCP] does not satisfy the Supreme Court's standards." Accordingly, the court concluded that the RCP "is not presumptively constitutional and is therefore subject to strict scrutiny." The court concluded that "[t]he General Assembly has failed to demonstrate that [the RCP] is narrowly tailored to a compelling governmental interest, and . . . therefore . . . conclude[d] that the [RCP] is unconstitutional."

¶ 59 Accordingly, the trial court was required to adopt a new, constitutionally

compliant congressional plan. "Given that the ultimate authority and directive is given to the Legislature to draw redistricting maps," the trial court declined to adopt Plaintiffs' proposed plans. Instead, it concluded "that the appropriate remedy is to modify the [RCP] to bring it into compliance with the Supreme Court's order. *See* N.C.G.S. § 120-2.4(a1)." The trial court concluded that the Modified RCP "as proposed by the Special Masters satisfies the Supreme Court's standards and should be adopted . . . for the 2022 North Carolina Congressional elections."

¶ 60        Based on these factual findings and legal conclusions, the trial court then ordered the following:

> 1. The [RSP] and [RHP] . . . are hereby APPROVED by the [c]ourt.
>
> 2. The [RCP] . . . is hereby NOT APPROVED by the [c]ourt.
>
> 3. The [Modified RCP] as recommended by the Special Masters is hereby ADOPTED by the [c]ourt and approved for the 2022 North Carolina Congressional elections.

¶ 61        On 23 February 2022, contemporaneously with its remedial order, the trial court issued an order denying Legislative Defendants' motion to disqualify Drs. Wang and Jarvis "for the reasons expressed in the Special Masters' Report."

**C. Present Appeal**

¶ 62        Following the trial court's remedial order, all parties appealed to this Court. Harper Plaintiffs and NCLCV Plaintiffs appealed the trial court's acceptance of the

RSP. Plaintiff Common Cause appealed the trial court's acceptance of both the RSP and RHP and the trial court's determination that the General Assembly satisfied racially polarized voting requirements. Legislative Defendants appealed the trial court's rejection of the RCP. We briefly summarize each party's arguments in turn.

¶ 63          First, Harper Plaintiffs and NCLCV Plaintiffs argue that the trial court erred in approving the RSP. They argue that the evidence shows that the RSP constitutes a partisan gerrymander that violates the *Harper* standard by creating stark partisan asymmetry; that is, by failing to give voters of all parties substantially equal opportunity to translate votes into seats. They contend that under *Harper*, individual statistical metrics can *inform* but not *replace* the determination as to whether a map complies with this foundational principle. They assert that the trial court erroneously used two statistical measures (mean-median difference and efficiency gap) as a substitute for constitutional compliance, and therefore that its approval of the RSP must be rejected. Specifically, they contend that two of the trial court's factual findings—those finding that the RSP falls within certain statistical ranges and that any remaining partisan skew can be explained by political geography—lack competent evidence, and indeed are contrary to the evidence. Approving the trial court's approach, they warn, would greenlight partisan gerrymandering and gamesmanship by allowing the General Assembly to create maps that meet certain metrics but nevertheless still create stark partisan asymmetry. Finally, they argue

that after rejecting the RSP, this Court should ensure that lawful maps endure by ordering that a new remedial map be adopted not just for this year, but until the next redistricting cycle following the 2030 census. This result is required, they assert, based on the prohibition against mid-decade redistricting within article II, sections 3 and 5 of the North Carolina Constitution.[6]

¶ 64     Second, Plaintiff Common Cause argues that the trial court failed to evaluate whether the RHP and RSP comport with all constitutional requirements by failing to fully consider evidence of racially polarized voting. They contend that the RHP and RSP dilute the voting strength of Black voters and destroy functioning crossover districts in violation of equal protection principles.[7] Separately, they argue that both the RHP and RSP must be struck down as unconstitutional partisan gerrymanders in violation of the *Harper* standard. They assert that the RHP and RSP deny substantially equal voting power, that the trial court's attribution of the plans' partisan bias to political geography is legally and factually erroneous, and that the plans therefore must receive and necessarily fail strict scrutiny. Accordingly, they argue that this Court should ensure constitutional compliance by adopting Common

---

[6] In response, Legislative Defendants argue that the trial court's approval of the RHP and RSP should be affirmed and that this Court lacks the authority to adopt an alternative remedial plan.

[7] In response, Legislative Defendants argue that the General Assembly properly performed RPV analysis, which showed that majority-minority districts are not required to comply with Section 2 of the Voting Rights Act.

Cause's proposed remedial maps.

¶ 65 Third, Legislative Defendants argue that the trial court erred in rejecting the RCP and adopting the Modified RCP. They contend that the trial court failed to give the RCP proper deference accorded to legislative enactments, and that the Special Masters' findings regarding the RCP were clearly erroneous. Further, Legislative Defendants argue that the trial court abused its discretion in denying Legislative Defendants' motion to disqualify Special Masters' Advisors Drs. Wang and Jarvis. Accordingly, they assert that this Court should reverse the trial court's approval of the Modified RCP and its denial of their motion to disqualify.[8]

¶ 66 On 13 July 2022, Legislative Defendants filed with this Court a motion to dismiss "the entirety of their portion of" this appeal. Therein, Legislative Defendants asserted that dismissal of their own previous appeal was appropriate because the Modified RCP "ordered by the trial court is only applicable to the 2022 election, and that map will apply to the 2022 election regardless of the outcome of the appeal in this Court." In response, Harper Plaintiffs and NCLCV Plaintiffs opposed Legislative Defendants' motion to dismiss, arguing that the motion constitutes "a transparent effort to prevent this Court from addressing important questions—questions that Legislative Defendants have erroneously told the U.S. Supreme Court are

---

[8] In response, Plaintiffs argue that the trial court properly rejected the RCP and denied Legislative Defendants' motion to disqualify.

unresolved—about the meaning of North Carolina statutes that authorize North Carolina courts to conduct state constitutional review of congressional-districting plans, including [N.C.G.S.] §§ 1-267.1(a), 120-2.3, and 120-2.4."

¶ 67     This case came before this Court for oral argument again on 4 October 2022.

## II.     Analysis

¶ 68     Now, this Court must review the alignment of the trial court's remedial order with the foundational principles established in *Harper*. "When the trial court conducts a trial without a jury, the trial court's findings of fact have the force and effect of a jury verdict and are conclusive on appeal if there is competent evidence to support them . . . ." *Stephenson v. Bartlett*, 357 N.C. 301, 309 (2003) (cleaned up). If this Court determines "that the findings of fact are supported by the evidence, we must then determine whether those findings of fact support the conclusions of law." *Id.* This Court reviews a trial court's conclusions of law de novo. *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 332 (2019). After consideration, we affirm the trial court's rejection of the RCP, affirm the trial court's approval of the RHP, and reverse the trial court's approval of the RHP. Before reaching these determinations, we must address Legislative Defendants' motion to dismiss this appeal, which we deny. Finally, we must also address Plaintiff Common Cause's equal protection arguments, which we reject.

**A. Legislative Defendants' Motion to Dismiss Appeal**

¶ 69 As an initial matter, we must address Legislative Defendants' motion to dismiss their own appeal. Because this motion was raised for the first time in this Court, we review it within our own discretion. After consideration, we deny Legislative Defendants' motion.

¶ 70 In essence, Legislative Defendants contend that their appeal should be dismissed because its outcome will have limited impact. That is, regardless of whether this Court affirms or reverses the portion of the trial court's order rejecting of the RCP and adopting the Modified RCP, the Modified RCP has already been used in the November 2022 elections and will ostensibly be replaced before future elections. Harper Plaintiffs and NCLCV Plaintiffs, by contrast, contend that Legislative Defendants' motion seeks to "have it both ways" by "arguing about the meaning of North Carolina law to the U.S. Supreme Court while simultaneously withdrawing any attempts to have this Court address their misinterpretation of state statutes and the state constitution."

¶ 71 Lacking a crystal ball with which to divine Legislative Defendants' purpose, we turn to context. While Legislative Defendants' motion correctly notes that "2022 is the only election to which the [Modified RCP] will apply," that has been true since the trial court issued its remedial order adopting the Modified RCP on 23 February 2022. Since then, Legislative Defendants not only appealed the trial court's ruling

regarding the RCP, but have continued to move their appeal forward through motions practice throughout the spring and into the summer.

¶ 72       On 30 June 2022, however, the Supreme Court of the United States granted Legislative Defendants' petition for certiorari in *Moore v. Harper. cert. granted*, 142 S. Ct. 2901 (2022). There, the Court will consider whether the federal Constitution's Elections Clause prohibits state courts from resolving state constitutional challenges to a state legislature's congressional redistricting plans. Within their petition, Legislative Defendants rebut Plaintiffs' claim that certain state statutes expressly authorize state courts to review challenges to congressional redistricting plans for compliance with the state Constitution. On 8 July 2022, Plaintiffs each filed a notice with this Court noting this development. Legislative Defendants filed their motion to dismiss their own appeal in this Court three business days later.

¶ 73       This chronology is impossible to ignore, and indicates that Legislative Defendants sought to dismiss their own appeal in order to avoid a ruling by this Court that might affect their arguments before the Supreme Court of the United States. In any event, this issue is of great significance to the jurisprudence of our state and is squarely and properly before this Court through the trial court's remedial order and Legislative Defendants' subsequent appeal. Accordingly, we deny Legislative Defendants' motion to dismiss.

**B. *Harper*'s Constitutional Standard**

¶ 74    Next, before reviewing the Remedial Plans, we take this opportunity to clarify and reaffirm the constitutional standard recognized by this Court in *Harper v. Hall*, 380 N.C. 317, 2022-NCSC-17.

¶ 75    Constitutional compliance is not grounded in narrow statistical measures, but in broad fundamental rights. Therefore, a trial court reviewing the constitutionality of a challenged proposed districting plan must assess whether that plan upholds the fundamental right of the people to vote on equal terms and to substantially equal voting power. *Harper*, ¶ 7. This fundamental right "encompasses the opportunity to aggregate one's vote with likeminded citizens to elect a governing majority of elected officials who reflect those citizens' views." *Id*. ¶ 160. Put differently, it requires that "voters of all political parties [have] substantially equal opportunity to translate votes into seats." *Id*. ¶ 163.

> When, on the basis of partisanship, the General Assembly enacts a districting plan that diminishes or dilutes a voter's opportunity to aggregate with likeminded voters to elect a governing majority—that is, when a districting plan systematically makes it harder for individuals because of their party affiliation to elect a governing majority than individuals in a favored party of equal size—the General Assembly deprives on the basis of partisan affiliation a voter of his or her right to equal voting power.

*Id*. ¶ 160.

¶ 76    Although *Harper* mentions several potential datapoints that may be used in

assessing the constitutionality of a proposed districting plan, those measures are not substitutes for the ultimate constitutional standard noted above. *See id.* ¶¶ 165–69. That is, a trial court may not simply find that a districting plan meets certain factual, statistical measures and therefore dispositively, legally conclude *based on those measures alone* that the plan is constitutionally compliant. Constitutional compliance has no magic number. Rather, the trial court may consider certain datapoints within its wider consideration of the ultimate legal conclusion: whether the plan upholds the fundamental right of the people to vote on equal terms and to substantially equal voting power.

¶ 77 This is for good reason. As both Plaintiffs and Legislative Defendants recognize, individual datapoints are vulnerable to manipulation and are not independently dispositive of whether a map gives all voters a substantially equal opportunity to translate votes into seats. Rather, it is only when these metrics and record evidence align to "demonstrate[ ] [that] there is a significant likelihood that the districting plan will give the voters of all political parties substantially equal opportunity to translate votes into seats across the plan" that a challenged plan may again be considered presumptively constitutional. *Id.* ¶ 163.

¶ 78 Contrary to the claims of the dissent, applying this standard, though of course imperfect, is not impossible. There are many possible redistricting maps that could uphold the fundamental right of all voters to vote on equal terms, just as there are

many possible factors that a trial court may consider in assessing the ultimate constitutionality of those maps. This is because our constitution speaks in broad foundational principles, not narrow statistical calculations. As in other realms, the absence of any one dispositive mathematical metric in redistricting does not absolve the judiciary of its constitutional duty to interpret and protect the constitutional rights of the citizens of our state. *See Corum*, 330 N.C. at 783 ("It is the state judiciary that has the responsibility to protect the state constitutional rights of the citizens . . . ."). Indeed, the very history of this case itself reveals that the judiciary, though not always in perfect agreement, may meaningfully engage with these principles toward the shared goal of ensuring the preservation of constitutional rights and the maintenance of our sacred system of democratic governance.

¶ 79        Here, the trial court appears to have leaned very heavily upon its factual findings regarding two datapoints, mean-median difference and efficiency gap, in reaching its ultimate legal conclusion that the RHP and RSP "satisfy the Supreme Court's standards."[9] However, the trial court also expressly adopted into its factual findings the findings within the Special Masters' Report. That Report, in turn, considered within its determination not just these two datapoints, but also "the findings of the advisors on the partisan symmetry analysis, the declination metrics, .

---

[9] To be clear, the ultimate standard for constitutional compliance originates from the fundamental rights enshrined in the Constitution itself, not from this Court.

. . their opinions on partisan bias and evidence of partisan gerrymandering[,]" and "the totality of the circumstances." Further, the trial court acknowledged the broader constitutional standard at least in passing in its factual findings regarding incumbency protection and traditional neutral districting criteria, which noted "the equal voting power requirements of the North Carolina Constitution." In so doing, the remedial order indicates that the trial court functionally considered how the evidence presented supported or undermined the compliance of the plans with the broader constitutional standard, rather than using two datapoints as substitutes for constitutional compliance.[10] However, we encourage future trial courts considering the constitutionality of districting plans to specify how the evidence does or does not support the plan's alignment with the broader constitutional standard of upholding the fundamental right to vote on equal terms and avoiding partisan asymmetry, not merely where its falls within certain statistical ranges.

## C. Remedial Congressional Plan

¶ 80 With the proper constitutional standard clarified, we must now review the trial court's legal conclusions regarding the constitutionality of the RCP, RHP, and RSP in alignment with that standard. We review conclusions of law de novo to determine whether they are supported by findings of fact. *Stephenson*, 357 N.C. at 309; *Sykes*,

---

[10] The trial court's brevity here must also be considered within the context of its extremely compressed schedule on remand.

372 N.C. at 332. Factual findings are conclusive on appeal if they are supported by competent evidence. *Stephenson*, 357 N.C. at 309. We first address the trial court's rejection of Legislative Defendants' RCP. After consideration, we affirm.

¶ 81      In Conclusion of Law 7, the trial court "conclude[d] that the [RCP] does not satisfy the Supreme Court's standards" for constitutional compliance. The trial court subsequently concluded that "the [RCP] is not presumptively constitutional and is therefore subject to strict scrutiny." The court ultimately concluded that because "[t]he General Assembly has failed to demonstrate that the[ ] [RCP] is narrowly tailored to a compelling governmental interest, . . . [it] is unconstitutional."

¶ 82      These conclusions of law are supported by Findings of Fact 28 through 35. Therein, the trial court found that the RCP was passed on a strict party-line vote, that the RCP "is not satisfactorily within the statistical ranges set forth" in *Harper*, and that "the partisan skew in the [RCP] is not explained by the political geography of North Carolina." Further, the Special Masters' Report, as expressly adopted in full into the trial court's remedial order, found that "there is substantial evidence from the findings of the advisors that the [RCP] has an efficiency gap above 7% and a mean-median difference of greater than 1%." After consideration of this evidence "along with the advisors' findings on the partisan symmetry analysis and the declination metrics," the Special Masters stated their "opinion that the [RCP] fails to meet the threshold of constitutionality." They therefore "recommend[ed] that the

[t]rial [c]ourt reject the [RCP] as being unconstitutional."

¶ 83 These factual findings are supported by competent evidence in the record. Specifically, none of the Special Masters' Advisors determined that the RCP yielded both an efficiency gap below 7% and a mean-median difference below 1%. Beyond these two measures, the Advisors determined that the RCP reflects stark and durable partisan asymmetry, as illustrated by their observations that Republicans would consistently win more seats than Democrats with the same share of votes across a variety of electoral conditions. More broadly, the Advisors determined that the RCP "consistently favors Republicans" across all applicable measures, "creates a distribution of voting strength across districts that is very lopsidedly Republican," and "should be viewed as a pro-Republican gerrymander." Finally, the Advisors determined that the RCP created far worse partisan asymmetry than possible alternatives.[11]

¶ 84 Collectively, this evidence amply supports the trial court's factual findings that the RCP does not satisfy constitutional standards. Those factual findings, in turn, adequately support the trial court's subsequent conclusion of law that the RCP must

---

[11] Of course, because there are any number of potential maps that could satisfy constitutional standards, the existence of an alternative plan with greater partisan symmetry does not dispositively prove the unconstitutionality of a less symmetrical plan. However, as with any other piece of evidence, the existence or absence of an alternative plan with significantly greater partisan symmetry—especially one that still honors traditional neutral districting criteria—may serve as one datapoint within the trial court's broader constitutional determination.

be assessed under, and fails, strict scrutiny. Accordingly, we affirm the trial court order's rejection of the RCP.

¶ 85   Next, we must address the trial court's subsequent remedy: the adoption of the Modified RCP. In Conclusion of Law 8, the trial court stated that "[g]iven the ultimate authority and directive is given to the Legislature to draw redistricting maps, we conclude that the appropriate remedy is to modify the Legislative [RCP] to bring it into compliance with the Supreme Court's order. *See* N.C.G.S. § 120-2.4(a1)." Subsequently, the court concluded that "[t]he [Modified RCP] as proposed by the Special Masters satisfies the Supreme Court's standards and should be adopted by th[e] [c]ourt for the 2022 North Carolina Congressional elections."

¶ 86   As an initial matter, the trial court is correct: N.C.G.S. § 120-2.4(a1) states, in pertinent part, that "[i]n the event the General Assembly does not act to remedy [a previously] identified defect[ ] to its [redistricting] plan within th[e] [required] period of time, the court may impose an interim districting plan." N.C.G.S. § 120-2.4(a1) (2021). The statute further clarifies that this interim plan "may differ from the districting plan enacted by the General Assembly only to the extent necessary to remedy any defects identified by the court." *Id*. In alignment with its broader statutory framework including N.C.G.S. § 1-267.1 (entitled "Three-judge panel for actions challenging plans apportioning or redistricting State legislative or congressional districts; claims challenging the facial validity of an act of the General

Assembly") and N.C.G.S. § 120-2.3 (entitled "Contents of judgments invalidating apportionment or redistricting acts), N.C.G.S. § 120-2.4 expressly authorizes judicial review of legislative redistricting plans for state constitutional compliance and judicial adoption of modified remedial plans in the event that the General Assembly fails to remedy constitutional defects within its own proposed plans. Accordingly, the trial court properly complied with N.C.G.S. § 120-2.4(a1) in adopting the Modified RCP.

¶ 87        Further, the trial court's conclusion of law that the Modified RCP satisfies the constitutional standard is supported by its findings of fact. These factual findings determined that the Modified RCP "was developed in an appropriate fashion, is consistent with N.C.G.S. § 120-2.4(a1), and is consistent with the North Carolina Constitution and the Supreme Court's full opinion." (Footnote omitted). The Special Masters' Report, as expressly adopted in full into the trial court's remedial order, likewise found that the Modified RCP "satisfies the requirements of the Supreme Court" and "achieves the partisan fairness and 'substantially equal voting power' required by the Supreme Court of North Carolina."

¶ 88        These findings of fact are supported by competent evidence. The evidence indicates that the Modified RCP "has an efficiency gap of 0.63%, a mean-median difference of 0.69%, seat bias of 0.28%, and vote bias of 0.10%." According to Dr. Grofman, "this is the most non-dilutive plan in partisan terms of any map that has

been submitted to the [c]ourt." Finally, the evidence indicates that the Modified RCP achieves this level of partisan symmetry while still complying with traditional neutral districting criteria such as "maintaining the number of county splits, retaining equal population, compactness, and contiguity, as well as respecting municipal boundaries."

¶ 89 Collectively, this evidence amply supports the trial court's factual findings that the Modified RCP was developed in an appropriate fashion, is consistent with N.C.G.S. § 120-2.4(a1), and meets constitutional standards. Those factual findings, in turn, adequately support the trial court's subsequent conclusion of law that adopting the Modified RCP is legally and constitutionally appropriate remedy. Accordingly, we affirm the trial court order's adoption of the Modified RCP.

**D. Remedial House Plan**

¶ 90 Second, we address the trial court's approval of Legislative Defendants' Remedial House Plan (RHP). After consideration, we affirm.

¶ 91 In Conclusion of Law 4, the trial court "conclude[d] that the [RHP] satisfies the Supreme Court's standards" for constitutional compliance. It subsequently concluded that "the [RHP is] presumptively constitutional" and that because "no evidence presented to the [c]ourt is sufficient to overcome this presumption[,] . . . th[e] [RHP is] therefore constitutional and will be approved."

¶ 92 These conclusions of law are supported by Findings of Fact 51 through 63, none

of which have been specifically challenged as unsupported by evidence. Therein, the trial court found that the RHP was "amended by six amendments offered by Democratic Representatives" and ultimately passed the House and Senate with sweeping bipartisan approval. The trial court found, "based upon and confirmed by the analysis of the Special Masters and their advisors, that the [RHP is] satisfactorily within the statistical ranges set forth in the Supreme Court's full opinion." The court found that "to the extent there remains a partisan skew in the [RHP], that partisan skew is explained by the political geography of North Carolina." Regarding the General Assembly's consideration of incumbency protection, the trial court found that "the measures taken by the General Assembly for the purposes of incumbency protection in the [RHP] were applied evenhandedly" and "are consistent with the equal voting power requirements of the North Carolina Constitution." The trial court found "that the General Assembly did not subordinate traditional neutral districting criteria to partisan criteria or considerations in the [RHP]." Further, the Special Masters' Report, as expressly adopted in full into the trial court's remedial order, found that "[t]he advisors as well as the experts of the parties . . . all found the efficiency gap of the [RHP] to be less than 7%" and "[t]he majority of the advisors and experts found the mean-median difference of the [RHP] to be less than 1%." The Special Masters determined, based on these facts and "the findings of the advisors on the partisan symmetry analysis, the declination metrics, and their opinions on

partisan bias and evidence of partisan gerrymandering," that "the [RHP] meets the test of presumptive constitutionality."

¶ 93 Moreover, these factual findings are supported by competent evidence. The Special Masters' Advisors determined that the RHP yields an average efficiency gap of about 2.88%, an average mean-median difference of about 1.27%, a partisan asymmetry of 2.9%, and a declination metric of 0.16. Although the RHP shows some Republican bias, the Advisors determined that the RHP "is genuinely far more competitive than either of the other two legislatively proposed maps" and "simply lacks the same clear indicia of egregious bias found in the previously rejected maps and still found . . . in the [RCP] and [RSP]." Dr. Jarvis determined that the RHP "appear[s] to be mostly typical in terms of the number of seats won," and Dr. McGhee observed that the RHP's similarity to the NCLCV proposed plan "hints that it may be difficult to do better while still abiding by other constraints." Contextually, the Advisors observed that neither the Harper Plaintiffs nor the NCLCV Plaintiffs challenged the RHP on appeal, and that the RHP "was passed by a clear bipartisan consensus in the legislature."

¶ 94 Collectively, this evidence supports the trial court's factual findings that the RHP meets constitutional standards. Those factual findings, in turn, adequately support the trial court's subsequent conclusion of law that the RHP is constitutional and should be approved. Accordingly, we affirm the trial court's order approving the

RHP. In accordance with article II section 5(4) of our Constitution, the RHP is now "established" under law and therefore "shall remain unaltered until the return of another decennial census of population taken by order of Congress."

**E. Remedial Senate Plan**

¶ 95　　　Third, we address the trial court's approval of Legislative Defendants' Remedial Senate Plan (RSP). After consideration, we reverse.

¶ 96　　　In Conclusion of Law 3, the trial court "conclude[d] that the [RSP] satisfies the Supreme Court's standards." It subsequently concluded that "the [RSP is] presumptively constitutional," and that because "no evidence presented to the [c]ourt is sufficient to overcome this presumption[,] . . . th[e] [RSP is] therefore constitutional and will be approved."

¶ 97　　　These conclusions of law are based on Findings of Fact 36 through 50, but, unlike for the RHP, are not supported by all of those findings. For instance, Finding of Fact 36 found that the RSP kept many of the same county groupings as the unconstitutional 2021 Senate plan. Finding of Fact 38 found that the RSP passed both chambers of the General Assembly on strict party-line votes. Finding of Fact 39 found that suggested Senate plans drawn by Democrats were rejected and only "the plan proposed by the Republican Redistricting and Election Committee members was then put to a vote by the Senate Committee and advanced to the full chamber." Though far from dispositive, these contextual factual findings undermine, rather

than support, the trial court's subsequent conclusion that the RSP meets constitutional standards of partisan symmetry. These contrary factual findings, in part, distinguish the trial court's analysis of the RSP from its analysis of the RHP,

¶ 98          Other findings of fact regarding the RSP, though supportive of the trial court's legal conclusions, are expressly challenged by Plaintiffs and, we conclude, are unsupported by competent evidence.[12] For instance, Finding of Fact 42 found that "based upon the analysis performed by the Special Masters and their advisors, . . . the [RSP] is satisfactorily within the statistical ranges set forth in the Supreme Court's full opinion." Finding of Fact 43 found "that to the extent there remains a partisan skew in the [RSP], that partisan skew is explained by the political geography of North Carolina." These two findings constitute the keystone of the trial court's factual support for its legal conclusion that the RSP is constitutionally compliant, but neither are supported by competent evidence.

¶ 99          First, Finding of Fact 42 is not supported by competent evidence. Far from supporting the constitutionality of the RSP, the analysis performed by the Special Masters and their Advisors strongly indicates that the RSP reflects "a substantial pro-Republican bias" that "should be viewed as a pro-Republican gerrymander" and constitutes "a significant outlier in favor of the Republicans." Statistically, all but one

---

[12] Because these factual findings are expressly challenged as lacking competent evidence, they require a more careful review than findings or conclusions that are more generally rebutted or wholly unmentioned.

Advisor, Dr. Wang, determined that the RSP yields a mean-median difference of over 1%, and the average of all four advisors' mean-median difference calculation is also above 1%. Even Dr. Wang concluded that the RSP indicates notable partisan bias in all six metrics evaluated. And because the Special Masters expressly noted that Dr. Wang's analysis "was not determinative of any recommendations made by the Special Masters to the court," it is clear that this finding of fact cannot rest on his single calculation alone. Further, the evidence indicates the RSP's durable partisan asymmetry is such that "in a tied election Republicans would still hold 27 or 28 seats, and that Democrats would need to win as much as 53 percent of the vote to claim 25 seats."

¶ 100        Finding of Fact 43 is likewise unsupported by competent evidence. There, the trial court found "that to the extent there remains a partisan skew in the [RSP], that partisan skew is explained by the political geography of North Carolina." As an initial matter, this finding is an incomplete statement of the requirement established in *Harper*, which stated that a court may use statistical measures in assessing "whether a meaningful partisan skew *necessarily results* from North Carolina's unique political geography." *Harper*, ¶ 163 (emphasis added). In any event, the evidence shows the opposite. The Advisors specifically determined that alternative remedial Senate plans often reflect "less than half the size of the [partisan] advantage in the Legislative Defendants' [RSP]," indicating "that there is nothing foreordained about

the advantages in the Legislative Defendants' plan." This evidence likewise distinguishes the RSP from the RHP, which was found to reflect very similar partisan symmetry as alternative plans, thus "hint[ing] that it may be difficult to do better while still abiding by [traditional] constraints." Indeed, when alternative plans reflect substantially less partisan asymmetry while adhering equally or better to traditional neutral redistricting criteria, it indicates that the more asymmetrical plan is necessarily *not* explained by political geography.

¶ 101        To be clear, none of these datapoints are individually dispositive. Cumulatively, though, they directly and significantly undermine, rather than support, the trial court's factual findings that the RSP satisfies constitutional standards. Given this lack of competent evidentiary support, these challenged findings of fact must be rejected as support for their subsequent legal conclusions.

¶ 102        Without these keystone factual findings, the trial court's subsequent conclusions of law crumble. That is, without any findings that the RSP satisfies constitutional standards, the trial court's conclusion affirming the RSP's constitutionality is wholly unsupported and likewise fails. Accordingly, we reverse the trial court's approval of the RSP.

¶ 103        Given this reversal, this Court must now implement a remedy. Under N.C.G.S. § 120-2.4(a1), when "the General Assembly does not act to remedy any identified defects" to a remedial districting plan, "the court may impose an interim districting

plan . . . that . . . differ[s] from the districting plan enacted by the General Assembly only to the extent necessary to remedy any defects identified by the court." In accordance with this express statutory authorization and the Court's constitutional authority to remedy the violation of fundamental rights, *see Corum*, 330 N.C. at 783, we remand this case to the trial court to oversee the creation of a Modified RSP. This plan must modify Legislative Defendants' RSP only to the extent necessary to achieve constitutional compliance by ensuring that individuals "of all political parties are given substantially equal opportunity to translate votes into seats across the plan." *Harper*, ¶ 163. Upon its review, if the trial court concludes that the proposed Modified RSP meets this constitutional standard, then we instruct the trial court to adopt the Modified RSP.

**F. Legislative Defendants' Motion to Disqualify Special Masters' Advisors**

¶ 104     Next, we must address Legislative Defendants' contention that the trial court abused its discretion in denying Legislative Defendants' motion to disqualify two of the Special Masters' Advisors. This Court reviews a trial court's discretionary ruling for an abuse of that discretion. *Davis v. Davis*, 360 N.C. 518, 523 (2006). "A trial court may be reversed for abuse of discretion only upon a showing that its actions are 'manifestly unsupported by reason.' " *Id.* (quoting *Clark v. Clark*, 301 N.C. 123, 129 (1980)). We hold that the trial court did not abuse its discretion in denying Legislative Defendants' motion to disqualify for three reasons.

¶ 105    First, while "the analysis provided by Drs. Wang and Jarvis was helpful . . . , it was not determinative of any recommendations made by the Special Masters to the [c]ourt." Second, the ex parte communications between the Advisors and Plaintiffs' experts "do not appear to have been made in bad faith" and "were solely for the purpose of proceeding as quickly as possible within the abbreviated time frame allotted for the remedial process." Third, all of the information sought by the Advisors "was publicly available . . . at the time of the communications questioned." Accordingly, the trial court's denial of Legislative Defendants' motion to disqualify was amply supported by reason. We therefore affirm the trial court's denial of Legislative Defendants' motion.

**G. Equal Protection Challenge**

¶ 106    Finally, we must address Plaintiff Common Cause's equal protection arguments. Specifically, Common Cause contends that RHP District 10 and RSP District 4 violate state equal protection requirements by failing to protect against vote dilution for Black voters and due to the intentional destruction of functioning crossover districts for Black voters. In response, Legislative Defendants assert the General Assembly satisfactorily performed a racially polarized voting analysis which showed that majority-minority districts are not required for Voting Rights Act (VRA) compliance, and that the General Assembly lacked good reason to conclude that drawing remedial districts without reference to race was required to protect from

VRA Section 2 liability. Because this Court has already reversed the trial court's constitutional approval of the RSP, we focus primarily on Plaintiff Common Cause's RHP challenge. After consideration, we reject Plaintiff Common Cause's claim.

¶ 107       In *Harper*, this Court held "that under *Stephenson*, the General Assembly was required to conduct a racially polarized voting analysis prior to drawing district lines." *Harper*, ¶ 214. We further noted that this responsibility "arises from our state constitution and decisions of this Court, including primarily *Stephenson*, and not from the VRA itself, or for that matter from any federal law." *Id*.

¶ 108       Here, the trial court concluded that the RHP satisfied constitutional standards, which include principles of equal protection. This conclusion of law, as it relates to equal protection principles, was supported by Findings of Fact 16 and 17. Therein, the trial court found that "[t]he General Assembly conducted an abbreviated racially polarized voting ("RPV") analysis to determine whether racially polarized voting is legally sufficient in any area of the state such that Section 2 of the [VRA] requires the drawing of a district to avoid diluting the voting strength of African American voters during the remedial process." The trial court found that "Legislative Defendants' expert Dr. Jeffery B. Lewis ran an analysis and concluded that all three Remedial Plans provide African Americans with proportional opportunity to elect their candidates of choice." Accordingly, the trial court determined "that the General Assembly satisfied the directive in the Supreme Court Remedial Order to determine

whether the drawing of a district in an area of the state is required to comply with Section 2 of the [VRA]."

¶ 109      The evidence on this issue, though limited, supports the trial court's limited findings of fact and conclusion of law. Specifically, the record reflects that the General Assembly conducted RPV analysis during its remedial process in compliance with this Court's order and opinion in *Harper*, and that this analysis concluded that the RHP met threshold requirements of providing Black voters with proportional opportunity to elect candidates of their choice. Although Plaintiff Common Cause notes contrary evidence indicating decreases in Black voting age population percentages within the two challenged districts under the RHP and RSP, this evidence does not lead to a conclusion that the trial court's findings are unsupported by competent evidence. Further, because the federal authorities cited by Plaintiff Common Cause do not *require* the General Assembly to create functioning crossover districts based on this data under state equal protection principles, this Court is not in a position to consider Plaintiff's requested remedy within an exclusively state law claim in state court. Accordingly, we affirm the trial court's approval of the RHP on equal protection principles.

### III.    Conclusion

¶ 110      Our Constitution's Declaration of Rights vests in the people of this state the fundamental right to vote on equal terms. N.C. Const. art. I, §§ 1 (equality and rights

of persons), 2 (sovereignty of the people), 10 (free elections), 12 (freedom of assembly), 14 (freedom of speech), 19 (equal protection of the laws); *see Harper*, ¶ 158–59 (summarizing these principles and rights). In exercising its redistricting authority, the General Assembly is required to respect and uphold this fundamental right. *Id.* ¶ 160. Therefore, when the General Assembly enacts a districting plan that systematically makes it harder for certain voters to elect a governing majority based on partisan affiliation, that plan "is subject to strict scrutiny and is unconstitutional unless the General Assembly can demonstrate that the plan is narrowly tailored to advance a compelling governmental interest." *Id.* ¶ 161 (cleaned up). While individual datapoints about a districting plan may be helpful toward *assessing* constitutional compliance, they are not *substitutes* for constitutional compliance. Ultimately, a districting plan must comply with the broader constitutional standard of upholding the right to vote on equal terms and to substantially equal voting power. *Id.* ¶ 160.

¶ 111     Here, the trial court properly determined that Legislative Defendants' Remedial Congressional Plan fell short of that standard. In accordance with N.C.G.S. § 120-2.4(a1), it then properly adopted a Modified RCP. Therefore, we affirm the trial court's rejection of the RCP and adoption of the Modified RCP.

¶ 112     Next, the trial court properly determined that Legislative Defendants' Remedial House Plan met constitutional standards. We therefore affirm the trial court's approval of the RHP for use through the next decennial redistricting cycle.

¶ 113    However, the trial court erred in its determination that Legislative Defendants' Remedial Senate Plan met constitutional standards. Specifically, the trial court's legal conclusion that the RSP is constitutionally compliant is unsupported by findings of fact that are supported by competent evidence. Rather, the evidence strongly indicates that the RSP creates stark partisan asymmetry in violation of the fundamental right to vote on equal terms. We therefore reverse the trial court's approval of the RSP.

¶ 114    In accordance N.C.G.S. § 120-2.4(a1), we now remand this case to the trial court to oversee the creation of a Modified RSP that modifies Legislative Defendants' RSP only to the extent necessary to achieve constitutional compliance. After assessing the Modified RSP for constitutional compliance, we instruct the trial court, in accordance with N.C.G.S. § 120-2.4(a1), to adopt this Modified RSP.

¶ 115    If our state is to realize its foundational ideals of equality and popular sovereignty, it must first "ensure that the channeling of 'political power' from the people to their representatives in government through elections, the central democratic process envisioned by our constitutional system, is done on equal terms." *Harper*, ¶ 223. Only then will ours truly be "a 'government of right' that 'originates from the people' and speaks with their voice." *Id*. As expressed in *Harper*, it remains the sincere hope of this Court that our state's leaders will exercise their constitutional authority—in redistricting and all other realms—in a manner that upholds these

fundamental rights and principles. *Id.* Until then, it remains the solemn constitutional duty of this Court and our state judiciary to stand in the breach.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

Chief Justice NEWBY dissenting.

To which branch of government does our constitution place the role of redistricting? The constitution expressly gives that responsibility to the legislative branch; even the majority so concedes. While paying lip service to this express grant of authority, the majority retains for itself the ultimate redistricting responsibility. As previously warned in the initial dissent in this case,

> [t]he majority replaces established principles with ambiguity, basically saying that judges alone know which redistricting plan will be constitutional and accepted by this Court based on analysis by political scientists. This approach ensures that the majority now has and indefinitely retains the redistricting authority, thereby enforcing its policy preferences.

*Harper v. Hall* (*Harper I*), 380 N.C. 317, 2022-NCSC-17, ¶ 229 (Newby, C.J., dissenting).

Today this prediction is fulfilled. In *Harper I* the majority effectively amended the state constitution to establish a redistricting commission composed of judges and political science experts. When, however, this commission, using the majority's redistricting criteria, reached an outcome with which the majority disagrees, the majority freely reweighs the evidence and substitutes its own fact-finding for that of the three-judge panel. Again, as predicted, "[t]he four members of this Court alone will approve a redistricting plan which meets their test of constitutionality." *Id.* ¶ 309.

¶ 118     On remand, despite very challenging deadlines established by the majority, the General Assembly redrew its redistricting maps, this time using the guidelines discussed by this Court in *Harper I*. The General Assembly made the policy decision to use various approved, constitutionally compliant procedures. It chose appropriate county groupings, utilized the most widely accepted redistricting software available, Maptitude, and adopted for its use the twelve statewide races suggested by one of plaintiffs' experts. It made the policy decision to rely on the two, extensively peer-reviewed, political science tests suggested by the majority. The majority said that if a redistricting plan met these tests, it would be "presumptively constitutional." *Id.* ¶¶ 166–67 (majority opinion). All of the General Assembly's remedial plans met these tests according to the Maptitude software.

¶ 119     The three-judge panel, its Special Masters, and their advisors did not give any deference to the General Assembly's policy choices listed above. Each advisor used his own preferred software and set of elections to analyze the remedial plans. Nevertheless, the Special Masters recommended, and the three-judge panel concluded, that the remedial House plan (RHP) and the remedial Senate plan (RSP) complied with the majority's criteria from *Harper I*. The three-judge panel, however, summarily rejected the remedial Congressional plan (RCP), as recommended by the Special Masters, and judicially adopted a plan created by the Special Masters in consultation with their advisors.

¶ 120        Now the majority agrees with the three-judge panel's acceptance of the RHP and its rejection of the RCP. The majority, however, holds unconstitutional beyond a reasonable doubt the RSP. While accepting the three-judge panel's findings of fact for the RHP, the majority wrongly reweighs the evidence, determines credibility, and substitutes its own judgment for that of the three-judge panel in order to strike down the RSP.

¶ 121        Despite the majority's judicial amendments to our constitution to create an active role for itself in redistricting, our case law directs that the General Assembly's policy determinations in enacting laws are entitled to a presumption of constitutionality. *See State ex rel. McCrory v. Berger*, 368 N.C. 633, 639, 781 S.E.2d 248, 252 (2016). Showing that a policy decision is unconstitutional requires proof beyond any reasonable doubt. *See, e.g., Jenkins v. State Bd. of Elections*, 180 N.C. 169, 172, 104 S.E. 346, 348 (1920). In compliance with the majority's directive, the General Assembly chose Maptitude, a set of twelve statewide elections, and two political science tests, Mean-Median Difference and Efficiency Gap, which were specifically approved in *Harper I*.

¶ 122        No one has challenged the General Assembly's policy choices as unconstitutional. According to Maptitude, all three remedial maps satisfied the Mean-Median Difference and Efficiency Gap criteria, thus meeting the majority's own test for presumptive constitutionality—this test being in addition to the

long-standing requirement that we treat all acts of the General Assembly as constitutional.

¶ 123          Neither the majority nor the three-judge panel gave any deference to these policy choices. Instead, they disrespect another branch of government by treating the General Assembly as just another participant in their redistricting process. While the three-judge panel correctly upheld the RHP and the RSP, it wrongly rejected the RCP. The majority now wrongly rejects the RSP and upholds the three-judge panel's rejection of the RCP. The majority has effectively overturned its own decision in *Harper I*. There it said that if the Remedial Plans met specified thresholds for certain political science-based tests, the plans would be "presumptively constitutional." *Harper I*, 2022-NCSC-17, ¶¶ 166–67. Now, reversing course, it says none of these test scores can entitle a proposed redistricting plan to a presumption of constitutionality. It appears the majority seeks to apply strict scrutiny to all of Legislative defendants' Remedial Plans.

¶ 124          By its actions today, the majority confirms the dangers of judicial usurpation of the legislative redistricting role. By intentionally stating vague standards, it ensures that four members of this Court alone understand what redistricting plan is constitutionally compliant. Apparently, the General Assembly, the three Special Masters (each a former jurist), and the three-judge panel were unable to discern the

constitutional "standard" set out in *Harper I*. Only the four justices here know what meets their standard.

¶ 125     When the constitution expressly assigns a task to a particular branch of government, the constitution prohibits the judicial branch from intruding into that task. Such intrusion violates separation of powers; the issue is nonjusticiable. Similarly, a matter is nonjusticiable if there is "a lack of judicially discoverable and manageable standards for resolving it." *Id.* ¶ 237 (Newby, C.J., dissenting) (quoting *Baker v. Carr*, 369 U.S. 186, 217, 82 S. Ct. 691, 710 (1962)). While the presence of either factor makes a matter nonjusticiable, both are present here.[1]

¶ 126     As previously stated,

> [t]he majority ignores [the Supreme Court's] warnings, fails to articulate a manageable standard, and seems content to have the discretion to determine when a redistricting plan is constitutional. This approach is radically inconsistent with our historic standard of review, which employs a presumption that acts of the General Assembly are constitutional, requiring identification of an express constitutional provision and a showing of a violation of that provision beyond a reasonable doubt.
>
> The Supreme Court cautioned that embroiling courts in cases involving partisan gerrymandering claims

---

[1] The majority wrongly states that the presence of both factors is required to render an issue nonjusticiable. *Harper I*, 2022-NCSC-17, ¶ 112 (majority opinion) ("This Court has recognized two criteria of political questions: (1) where there is 'a textually demonstrable constitutional commitment of the issue' to the 'sole discretion' of a 'coordinate political department[,]' *and* (2) those questions that can be resolved only by making 'policy choices and value determinations.' " (first alteration in original) (emphasis added) (quoting *Bacon v. Lee*, 353 N.C. 696, 717, 549 S.E.2d 840, 854 (2001))).

by applying an "expansive standard" would amount to an "unprecedented intervention in the American political process."

*Id.* ¶¶ 310−11 (quoting *Rucho v. Common Cause*, 139 S. Ct. 2484, 2498 (2019)). Sadly, the majority continues to do just that. I respectfully dissent.

## I.      Factual and Procedural History

### A. Initial Litigation

¶ 127      As required by both our state constitution and the Federal Constitution, the General Assembly, following the 2020 census, enacted redistricting plans for the North Carolina Senate and House of Representatives and for the North Carolina districts for the United States House of Representatives on 4 November 2021 (2021 Plans). North Carolina League of Conservation Voters (NCLCV) plaintiffs and Harper plaintiffs each challenged the legality of these plans, arguing they "establish[ed] severe partisan gerrymanders" and "engag[ed] in racial vote dilution" in violation of the Free Elections Clause, the Equal Protection Clause, the Freedom of Speech and Assembly Clauses, and the Whole County Provisions of the North Carolina Constitution. *See* N.C. Const. art. I, §§ 10, 19, 12, 14; *id.* art. II, §§ 3(3), 5(3). Both groups of plaintiffs also sought a preliminary injunction to enjoin use of the 2021 Plans.

¶ 128      The NCLCV and Harper actions were consolidated and assigned to a three-judge panel of the Superior Court in Wake County. On 3 December 2021, the

three-judge panel denied both NCLCV plaintiffs' and Harper plaintiffs' motions for preliminary injunction. NCLCV plaintiffs and Harper plaintiffs filed a notice of appeal with the North Carolina Court of Appeals.

¶ 129          The Court of Appeals denied NCLCV plaintiffs' and Harper plaintiffs' request for a temporary stay. NCLCV plaintiffs and Harper plaintiffs then filed several items with this Court, including two petitions for discretionary review prior to determination by the Court of Appeals, a motion to suspend appellate rules to expedite a decision, and a motion to suspend appellate rules and expedite schedule. On 8 December 2021, this Court allowed NCLCV plaintiffs' and Harper plaintiffs' petitions for discretionary review, granted a preliminary injunction, and temporarily stayed the candidate filing period for the 2022 election cycle "until such time as a final judgment on the merits of [NCLCV and Harper] plaintiffs' claims, including any appeals, is entered and [a] remedy, if any is required, has been ordered." In the same order, this Court also directed the three-judge panel to hold proceedings on "the merits of plaintiffs' claims and to provide a written ruling on or before . . . January 11, 2022."

¶ 130          Subsequently, Common Cause moved to intervene in the consolidated proceedings as a plaintiff on 13 December 2021. The three-judge panel granted Common Cause's motion to intervene, and on 16 December 2021, Common Cause filed its complaint alleging the 2021 Plans violated the Equal Protection Clause, the

Free Elections Clause, and the Freedom of Speech and Freedom of Assembly Clauses of the North Carolina Constitution. Hereinafter, NCLCV plaintiffs, Harper plaintiffs, and Common Cause are collectively referred to as "plaintiffs."

¶ 131  Legislative defendants filed their Answers on 17 December 2021. Thereafter, the parties engaged in an "expedited two-and-a-half-week" discovery period, during which the three-judge panel ruled on ten discovery-related motions and the parties collectively designated ten expert witnesses and submitted accompanying reports. Altogether, the parties collectively submitted over 1000 pages of reports and materials to the three-judge panel. After the discovery period closed on 31 December 2021, the three-judge panel commenced a three-and-one-half day trial on 3 January 2022 during which it received approximately 1000 exhibits into evidence and testimony from numerous fact and expert witnesses.

¶ 132  On 11 January 2022, the three-judge panel entered a judgment concluding that plaintiffs' partisan gerrymandering claims presented nonjusticiable, political questions because redistricting "is one of the purest political questions which the legislature alone is allowed to answer." Additionally, the three-judge panel concluded that the 2021 Plans did not violate North Carolina's Declaration of Rights because "[t]he objective constitutional constraints that the people of North Carolina have imposed on legislative redistricting are found in Article II, Sections 3 and 5 of the

1971 Constitution and not the Free Elections, Equal Protection, Freedom of Speech or Freedom of Assembly Clauses found in Article I of the 1971 Constitution."

¶ 133      Pursuant to this Court's 8 December 2021 order certifying the case for review prior to determination by the Court of Appeals, all plaintiffs filed notices of appeal to this Court from the three-judge panel's judgment. The case was argued before this Court on 2 February 2022. On 4 February 2022, in a four-to-three decision, this Court entered an Order (Remedial Order) adopting the findings of fact from the three-judge panel's judgment but concluding that the 2021 Plans were "unconstitutional beyond a reasonable doubt under the free elections clause, the equal protection clause, the free speech clause, and the freedom of assembly clause of the North Carolina Constitution." The Remedial Order reversed and remanded the matter to the three-judge panel for remedial proceedings and noted that a full opinion would follow. Three justices filed a dissent to the Remedial Order.

## B. *Harper I*

¶ 134      Ten days later, the four-justice majority issued its full opinion. *See Harper I*, 380 N.C. 317, 2022-NCSC-17. The majority opinion first held that "partisan gerrymandering claims are justiciable in North Carolina courts under the . . . [North Carolina] Declaration of Rights" because there are "several manageable standards for evaluating the extent to which districting plans dilute votes on the basis of partisan affiliation." *Id.* ¶ 174.  Specifically, the majority determined that various

political science metrics could serve as a sufficient standard. *See id.* ¶¶ 163, 166–67. It indicated that a 1% or less Mean-Median Difference score and a 7% or less Efficiency Gap score could indicate a redistricting map is "presumptively constitutional." *See id.* ¶¶ 166–67. The majority, however, refused to state a precise standard, ultimately leaving that review to themselves. *Id.* ¶ 163 ("We do not believe it prudent or necessary to, at this time, identify an exhaustive set of metrics or precise mathematical thresholds which conclusively demonstrate or disprove the existence of an unconstitutional partisan gerrymander.").

¶ 135        Next, the majority held that "[p]artisan gerrymandering of legislative and congressional districts violates the free elections clause, the equal protection clause, the free speech clause, and the freedom of assembly clause" of the North Carolina Constitution. *Id.* ¶ 160. Specifically, the majority reasoned that these provisions reflect "the principle of political equality," *id.* ¶ 158, which in turn requires that "the channeling of 'political power' from the people to their representatives in government through the democratic processes . . . must be done on equal terms," *id.* Accordingly, the majority concluded that to comport with these provisions in the Declaration of Rights, the General Assembly "must not diminish or dilute on the basis of partisan affiliation any individual's vote" because "[t]he fundamental right to vote includes the right to enjoy 'substantially equal voting power and substantially equal legislative

representation.' " *Id.* ¶ 160 (quoting *Stephenson v. Bartlett* (*Stephenson I*), 355 N.C.
354, 382, 562 S.E.2d 377, 396 (2002)).

¶ 136        The majority determined that because "[t]he right to vote on equal terms is a
fundamental right in this state," strict scrutiny must apply once a party demonstrates
that a redistricting plan "infringes upon his or her fundamental right to substantially
equal voting power" based on partisan affiliation. *Id.* ¶ 181. To trigger strict scrutiny,
the majority held that a party must demonstrate that a redistricting plan "makes it
systematically more difficult for a voter to aggregate his or her vote with other
likeminded voters." *Id.* ¶ 180. A party may make this demonstration using a variety
of political science-based metrics and tests such as:

> median-mean difference analysis; efficiency gap analysis;
> close-votes-close[-]seats analysis[;] partisan symmetry
> analysis; comparing the number of representatives that a
> group of voters of one partisan affiliation can plausibly
> elect with the number of representatives that a group of
> voters of the same size of another partisan affiliation can
> plausibly elect; and comparing the relative chances of
> groups of voters of equal size who support each party of
> electing a supermajority or majority of representatives
> under various possible electoral conditions. Evidence that
> traditional neutral redistricting criteria were subordinated
> to considerations of partisan advantage may be
> particularly salient in demonstrating an infringement of
> this right.

*Id.* Once a party makes this initial demonstration, the challenged redistricting plan
"is unconstitutional [unless] the State can[ ] establish that it is narrowly tailored to
advance a compelling governmental interest." *Id.* ¶ 181 (quoting *Stephenson I*, 355

N.C. at 377, 562 S.E.2d at 393). The majority opined that "compliance with traditional neutral districting principles, including those enumerated in [the Whole County Provisions] of the North Carolina Constitution," might constitute a compelling governmental interest that would overcome strict scrutiny, but "[p]artisan advantage" is not. *Id.*

¶ 137 The majority then applied these principles to the three-judge panel's factual findings and determined that the evidence at trial demonstrated that all of the 2021 Plans were partisan gerrymanders. *Id.* ¶ 178. The majority then applied strict scrutiny to each map and concluded that the 2021 Plans were not "carefully calibrated toward advancing some compelling neutral priority." *Id.* ¶¶ 195, 213; *see id.* ¶ 205. To the contrary, the majority concluded that each map "prioritized considerations of partisan advantage above traditional neutral districting principles," and therefore, "must be rejected." *Id.* ¶ 213; *see id.* ¶¶ 195, 205.

¶ 138 The majority concluded its *Harper I* opinion by reversing and remanding the case to the three-judge panel and instructing the three-judge panel to "oversee the redrawing of the maps by the General Assembly, or, if necessary, by the court." *Id.* ¶ 223. The three dissenting justices determined plaintiffs' claims were non-justiciable. The dissent noted that our state constitution expressly assigns the redistricting responsibility to the General Assembly and that the majority failed to identify a

judicially discernable, manageable standard by which to adjudicate the partisan gerrymandering claims at issue. *See id.* ¶¶ 237−67 (Newby, C.J., dissenting).

**C. Remand**

**1. Three-Judge Panel's Initial Orders**

¶ 139 This Court's 4 February 2022 Remedial Order required an expedited process with abbreviated deadlines. The majority ordered the General Assembly to submit new congressional and state legislative districting plans "that satisfy all provisions of the North Carolina Constitution" by 18 February 2022. The Remedial Order also permitted plaintiffs to submit proposed remedial districting plans by the same deadline. The majority permitted all parties to file and submit comments on any of the submitted plans by 21 February 2022. The Remedial Order mandated that the three-judge panel "approve or adopt compliant congressional and state legislative districting plans no later than noon on 23 February 2022." Any party could file an emergency application for stay pending appeal by 5:00 P.M. on that same day.

¶ 140 On 8 February 2022, the three-judge panel entered an order requiring that each party who submitted a proposed remedial plan must also submit a corresponding explanation of the "data and other considerations" used in creating the plan. Specifically, each party had to explain whether "traditional neutral districting criteria" were used, whether incumbency was considered, whether any partisan skew

"necessarily result[ed] from North Carolina's unique political geography," and any political science metrics utilized.

¶ 141    In the same 8 February 2022 order, the three-judge panel also informed the parties of its intent to appoint Special Masters to assist the panel in reviewing the parties' proposed remedial plans and, if needed, in developing alternative remedial plans. The order permitted each party to submit to the three-judge panel suggested individuals to serve as a Special Master. Each of the parties submitted their suggestions, but the three-judge panel instead appointed three individuals of its own choosing—former jurists Robert F. Orr, Robert H. Edmunds, Jr., and Thomas W. Ross—in a 16 February 2022 order (Appointment Order).

¶ 142    The Appointment Order authorized the Special Masters to hire assistants "reasonably necessary to facilitate their work." The Special Masters hired four advisors to assist in evaluating the Remedial Plans: Dr. Bernard Grofman, Dr. Tyler Jarvis, Dr. Eric McGhee, and Dr. Samuel Wang. Notably, two of the advisors—Dr. Grofman and Dr. Jarvis—were recommended by NCLCV plaintiffs as potential Special Masters, and at least one of the advisors—Dr. Wang—filed a brief in support of plaintiff Common Cause in previous litigation surrounding redistricting in North Carolina. *See* Brief of *Amici Curiae* Professors Wesley Pegden, Jonathan Rodden, and Samuel S.-H. Wang in Support of Appellees 2, *Rucho v. Common Cause*, 139 S. Ct.

2484 (No. 05-1631). None of the advisors were recommended by Legislative defendants.

## 2. General Assembly's Remedial Process

¶ 143　　The General Assembly enacted new congressional and legislative plans (Remedial Plans) on 17 February 2022 and timely submitted them to the three-judge panel on 18 February 2022. Per the three-judge panel's 8 February 2022 and 16 February 2022 orders, the General Assembly also submitted a detailed memorandum describing the data and process used to create the Remedial Plans.

¶ 144　　The General Assembly understood *Harper I* as requiring it "to intentionally create more Democratic districts in the [Remedial Plans]." To achieve this task, the General Assembly started with a blank slate and followed the same process to create each map. Each redistricting committee kept the county groupings used for the 2021 Plans as base maps. Accordingly, any single district county groupings from each of the 2021 Plans were carried over to the Remedial Plans; otherwise, each map was entirely new.

¶ 145　　Next, each redistricting committee "dr[e]w new districts and ma[d]e adjustments tailored to legitimate criteria." The General Assembly made the policy decision to utilize Caliper's Maptitude redistricting software, a "widely accepted districting program," to draw and analyze the Remedial Plans. The General Assembly chose Maptitude, as opposed to another redistricting software, because it is "widely

accepted" in the field of redistricting and is "used by a supermajority of the state legislatures, political parties, and public interest groups." *Overview*: *Maptitude for Redistricting Software*, https://www.caliper.com/mtredist.htm (last visited Dec. 7, 2022).

¶ 146 Although expressly prohibited by its previous redistricting criteria, the General Assembly "used partisan election data as directed by the Supreme Court's Remedial Order" to achieve its goal of "intentionally creat[ing] more Democratic districts." The General Assembly made the policy decision to utilize partisan data from the set of elections that plaintiffs' expert, Dr. Mattingly, used to analyze the [2021 Plans]. This set of elections included: Lieutenant Governor 2016, President 2016, Commissioner of Agriculture 2020, Treasurer 2020, Lieutenant Governor 2020, U.S. Senate 2020, Commissioner of Labor 2020, President 2020, Attorney General 2020, Auditor 2020, Secretary of State 2020, and Governor 2020 (Mattingly Election Set). Non-partisan, central staff "loaded [the] partisan election data into Maptitude to view the projected effect on partisanship that resulted from changes to district lines."

¶ 147 After Maptitude produced initial House, Senate, and congressional maps, the General Assembly analyzed the partisan fairness of each map using two political science metrics—the Mean-Median Difference and the Efficiency Gap. The General Assembly chose these two metrics because "they have been peer-reviewed in

numerous articles by numerous scholars[ ] and because there is some (but not uniform) agreement among scholars regarding thresholds for measuring partisanship." For each of these metrics, the General Assembly selected threshold scores that, if achieved, would indicate that the relevant map contained an acceptable level of partisan fairness under *Harper I*.

¶ 148          The General Assembly selected threshold scores based on general agreement among political scientists:

> [I]t is widely considered by academics that a mean-median as close to zero as possible, but under [1%] is "presumptively constitutional." *See Harper v. Hall*, 2022 NCSC-17 ¶166. On the efficiency gap, scholars including NCLCV's Dr. Duchin have opined that anything below [8%] is presumptively legal while Dr. Jackman, used as an expert in *Gill v. Whitford*, and *Common Cause v. Rucho*, opined that anything below [7%] was constitutional.

The General Assembly also selected these threshold scores because the *Harper I* majority opined that they could indicate a presumptively constitutional level of partisanship:

> [U]sing the actual mean-median difference measure, from 1972 to 2016 the average mean-median difference in North Carolina's congressional redistricting plans was 1%. *Common Cause* [*v. Rucho*], 318 F. Supp. 3d [777,] 893 [(M.D.N.C. 2018)]. That measure instead could be a threshold standard such that any plan with a mean-median difference of 1% or less when analyzed using a representative sample of past elections is presumptively constitutional.

> With regard to the efficiency gap measure, courts have found "that an efficiency gap above 7% in any districting plan's first election year will continue to favor that party for the life of the plan." *Whitford v. Gill*, 218 F. Supp. 3d 837, 905 (W.D. Wis. 2016) *rev'd on other grounds,* 138 S. Ct. 1916 (2018). It is entirely workable to consider the seven percent efficiency gap threshold as a presumption of constitutionality, such that absent other evidence, any plan falling within that limit is presumptively constitutional.

*Harper I*, 2022-NCSC-17, ¶¶ 166–67 (majority opinion).

¶ 149 After making the policy choices of the political science metrics and threshold scores to be used, the General Assembly then adjusted each of the Remedial Plans until their Mean-Median Difference and Efficiency Gap scores were at or below the selected thresholds. After the adjustments were complete, Maptitude scored each of the Remedial Plans as follows:

|  | RHP | RSP | RCP |
|---|---|---|---|
| Mean-Median | 0.7% | 0.65% | 0.61% |
| Efficiency Gap | 0.84%[2] | 3.97% | 5.29% |

¶ 150 Along with prioritizing the creation of more "purportedly Democratic leaning districts" and ensuring the Remedial Plans scored well on the selected metrics, the

---

[2] Legislative defendants were "unable to find a legislative plan passed anywhere else in the country with a lower efficiency gap" than the RHP. Thus, it would be unfair to use this Efficiency Gap score as a required standard.

General Assembly also focused on the "neutral and traditional redistricting criteria" used in creating the 2021 Plans unless those criteria conflicted with *Harper I*.

¶ 151 After drawing their respective plans, each chambers presented their plans to the relevant redistricting committee. The General Assembly enacted the Remedial Plans on 17 February 2022 and submitted them to the three-judge panel on 18 February 2022.

¶ 152 After the General Assembly submitted the enacted Remedial Plans to the three-judge panel, plaintiffs submitted comments and objections. Significantly, none of the parties questioned the General Assembly's policy decision to utilize Maptitude or to use the Mattingly Election Set. The Special Masters also submitted a report on the Remedial Plans primarily based on four reports submitted by the advisors. Notably, in crafting their reports, none of the advisors used the General Assembly's chosen program, Maptitude, nor did they use the General Assembly's chosen Mattingly Election Set. Further, none of the advisors worked together in analyzing the Remedial Plans, nor did they submit a singular report. Instead, each advisor used his own preferred approach and summarized that approach in his own report.[3] The Special Masters' Report found that the RHP and RSP met the requirements of *Harper I* but that the RCP did not. Because the Special Masters concluded that the RCP was

---

[3] Despite the majority's numerous implications that the advisors filed a singular report, this is untrue. Each advisor used an individual approach and supplied his own individual analysis.

unconstitutional, they developed and submitted an alternative plan (Modified Congressional Plan), in consultation with one of the advisors, Dr. Bernard Grofman, for the three-judge panel to consider.[4]

¶ 153    In reviewing the Remedial Plans, the three-judge panel "adopt[ed] in full the findings of the Special Masters," and, like the Special Masters, concluded that the

---

[4] One could legitimately question the objectivity of this court-appointed, de facto "redistricting commission" when one of the Special Masters publicly participated in advertisements for a Democratic candidate in a statewide senatorial campaign and for a Democratic congressional candidate in a district he created during this remedial process. *See* Jim Stirling, *Former Justice Bob Orr Puts His Thumb on the Scale for Congressional Democrats*, John Locke Foundation (Nov. 7, 2022), https://www.johnlocke.org/former-justice-bob-orr-puts-his-thumb-on-the-scale-for-congressional-democrats/. Given this Special Master's direct participation in current elections involving a district he helped fashion, one wonders if the three-judge panel can allow his continued involvement.

Furthermore, one of the advisors to the Special Masters—Dr. Wang—came under investigation earlier this year for allegedly manipulating data in favor of Democrats in his role as a redistricting expert in another state. *See Princeton redistricting expert who analyzed N.C. voting maps faces university investigation*, WRAL News (April 28, 2022, 6:02 PM), https://www.wral.com/princeton-redistricting-expert-who-analyzed-nc-voting-maps-faces-university-investigation/20256616/.

Is the judicial creation of this "redistricting commission," which favors the political alignment of the majority of this Court, consistent with the fact that our constitution assigns the duty of redistricting to the General Assembly, which the people elected in 2020 using court-approved maps?

The majority upholds the three-judge panel's denial of Legislative defendants' motion to disqualify two of the Special Masters' advisors for improper ex parte communications with some of plaintiffs' experts. The motion, however, should have been allowed. The role of advisor—a purportedly neutral subject matter expert—to the three Special Masters is vital to a proper, unbiased evaluation of the legislative redistricting plans. The Special Masters, three-judge panel, and the majority, in reweighing the evidence, place great weight on the opinions of each of the advisors. If the challenged advisors had been judges who engaged in similar ex parte communications, they would have been removed from the case and possibly faced sanctions. If this de facto "redistricting commission" is to supervise the remedial redistricting process, it must be above reproach. The motion to disqualify Drs. Wang and Jarvis should have been granted.

RHP and RSP complied with the requirements of *Harper I*, but that the RCP was "not presumptively constitutional," was "subject to strict scrutiny," and was not "narrowly tailored to a compelling governmental interest." Accordingly, the three-judge panel concluded the RCP was unconstitutional. To support its holding, the three-judge panel relied primarily on the "analysis performed by the Special Masters and their advisors," and its conclusion that the RHP and RSP scored below the relevant thresholds for the Mean-Median Difference and Efficiency Gap metrics, but the RCP did not. The three-judge panel did not point to any other evidence regarding the purported level of partisan bias in the Remedial Plans.

¶ 154         Finally, because the three-judge panel rejected the General Assembly's RCP, it adopted the Modified Congressional Plan recommended by the Special Masters. All parties appealed.[5]

## II.        Standards of Review

### A.  Presumption of Constitutionality

¶ 155         In reviewing an act of the General Assembly, this Court is guided by a specific

---

[5] Legislative defendants have moved to dismiss their appeal of the court-generated Modified Congressional Plan, recognizing that, by statute, it will not be reused now that the recent 2022 election cycle has concluded. This Court invariably allows parties to craft their own appeals. The majority, however, believing a dismissal could hinder its own, self-appointed redistricting authority, denies Legislative defendant's motion. In doing so, the majority effectively punishes Legislative defendants for successfully seeking review by the Supreme Court of the United States of the role of state courts in congressional redistricting under the Federal Constitution. *See Moore v. Harper, cert. granted*, 1425 S. Ct. 2901 (2022).

and binding standard of review—the presumption of constitutionality. *See generally State ex rel. McCrory*, 368 N.C. at 639, 781 S.E.2d at 252. The presumption of constitutionality has been well established for over 150 years. *See, e.g.*, *Holton v. Bd. of Comm'rs*, 93 N.C. 430, 435 (1885). This standard sets a high bar which only the highest quantum of proof—proof beyond a reasonable doubt—will overcome, and the party challenging a statute bears the burden of establishing its unconstitutionality. *Jenkins*, 180 N.C. at 172, 104 S.E. at 348 ("The party who undertakes to pronounce a law unconstitutional takes upon himself the burden of proving beyond any reasonable doubt that it is so.").

¶ 156    The presumption of constitutionality is not merely a standard of review; it is a function of the fundamental separation-of-powers principle found in Article I, Section 6 of our constitution: "The legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other." Unquestionably, the separation-of-powers principle

> is the rock upon which rests the fabric of our government. Indeed, the whole theory of constitutional government in this State and in the United States is characterized by the care with which the separation of the departments has been preserved, and by a marked jealousy of encroachment by one upon another.

*Person v. Bd. of State Tax Comm'rs*, 184 N.C. 499, 502, 115 S.E. 336, 339 (1922).

¶ 157    The separation-of-powers clause is located within the Declaration of Rights in Article I, which is an expressive yet nonexhaustive list of protections afforded to

citizens against governmental intrusion, along with "the ideological premises that underlie the structure of government." John V. Orth & Paul Martin Newby, *The North Carolina State Constitution* 46 (2d ed. 2013) [hereinafter *State Constitution*]. Placement of the separation-of-powers clause in the Declaration of Rights suggests that keeping each branch within its described spheres protects the people by limiting overall governmental power. The clause does not establish the various powers but simply states the powers of the branches are "separate and distinct." N.C. Const. art. I, § 6. Subsequent constitutional provisions develop the nature of those powers. *State Constitution* 46 ("Basic principles, such as popular sovereignty and separation of powers, are first set out in general terms, to be given specific application in later articles.").

¶ 158      Because "a constitution cannot violate itself," *Leandro v. State*, 346 N.C. 336, 352, 488 S.E.2d 249, 258 (1997), a branch's exercise of its express, constitutional authority by definition comports with the separation-of-powers principle. Accordingly, a violation of separation of powers only occurs when one branch of government exercises, or prevents the exercise of, a power reserved for another branch of government. *State ex rel. McCrory*, 368 N.C. at 650, 781 S.E.2d at 259 (Newby, J., concurring in part and dissenting in part). Understanding the prescribed powers of each branch is the basis for stability, accountability, and cooperation within

state government. *See State v. Emery*, 224 N.C. 581, 584, 587−88, 31 S.E.2d 858, 861, 863−64 (1944).

¶ 159 The legislative power is vested in the General Assembly because "all people are present there in the persons of their representatives," *State Constitution* 95, and, therefore, the people act through the General Assembly, *see Baker v. Martin*, 330 N.C. 331, 336−37, 410 S.E.2d 887, 890 (1991). Pursuant to the text of the constitution, the General Assembly primarily exercises the people's political power though statutory enactments. *See* N.C. Const. art. II, §§ 22−23.

¶ 160 Relevant here, the General Assembly enacts redistricting plans through statute. In fact, both the Federal Constitution and the North Carolina Constitution expressly assign redistricting authority to the legislature. U.S. Const. art. I, § 4, cl. 1; N.C. Const. art. II, §§ 3, 5. Our state constitution also provides explicit limitations on the General Assembly's redistricting authority. N.C. Const. art. II. §§ 3, 5 (providing that each state Senator and state Representative must represent an equal number of people, each senate and representative district must consist of a contiguous territory, and senate and representative districts may not unduly divide counties).

¶ 161 The common law provided, and now the General Statutes provide, a limited role for the courts in reviewing the General Assembly's redistricting plans. *See* N.C.G.S. § 120-2.3 to -2.4 (2021). The General Assembly enacted these statutory

provisions in 2003 to limit and codify the common law process by which courts had been reviewing redistricting plans for some time. *See* An Act to Establish House Districts, Establish Senatorial Districts, and Make Changes to the Election Laws and to Other Laws Related to Redistricting, S.L. 2003-434, §§ 7−9, 2003 N.C. Sess. Laws (1st Extra Sess. 2003) 1313, 1415−16; *Stephenson I*, 355 N.C. at 385, 562 S.E.2d at 398. In fact, the General Assembly enacted these statutory provisions limiting the judicial branch's role in response to this Court's involvement in the redistricting process in 2001. *See Stephenson v. Bartlett* (*Stephenson III*), 358 N.C. 219, 221−22, 595 S.E.2d 112, 114−15 (2004). No doubt these limiting provisions, N.C.G.S. § 120-2.3 to -2.4; N.C.G.S. § 1-267.1 (2021), are in keeping with our federal and state constitutional provisions, U.S. Const. art. I, § 4, cl. 1; N.C. Const. art. II, §§ 3, 5.

¶ 162      Section 1-267.1 requires that a three-judge panel hear challenges to redistricting plans. N.C.G.S. § 1-267.1. Specifically, under N.C.G.S. § 120-2.3, courts review challenges regarding whether a redistricting plan is "unconstitutional or otherwise invalid." N.C.G.S. § 120-2.3. If a court finds a redistricting plan is unconstitutional, it must give the General Assembly an opportunity to remedy the identified defects by enacting a new redistricting plan. N.C.G.S. § 120-2.4(a). By statute, a court may not impose a remedial redistricting plan of its own unless "the General Assembly does not act to remedy" those defects. N.C.G.S. § 120-2.4(a1). Even then, a court-imposed redistricting plan may only differ from the General Assembly's

enacted plan "to the extent necessary to remedy" the defects identified by the court and will only be used for the next general election. *Id.* After the next general election, the General Assembly will replace the court-imposed map with a new, legislatively enacted map. This limited role of judicial review comports with the principle of separation of powers because it respects that redistricting "is a legislative responsibility." *Stephenson III*, 358 N.C. at 230, 595 S.E.2d at 119 ("Not only do these statutes allow the General Assembly to exercise its proper responsibilities, they decrease the risk that the courts will encroach upon the responsibilities of the legislative branch.").[6]

¶ 163    Without question, the legislative and policymaking powers belong to the General Assembly. *Rhyne v. K-Mart Corp.*, 358 N.C. 160, 169, 594 S.E.2d 1, 8 (2004). Because the people have granted the legislative power, including the specific power of redistricting, exclusively to the General Assembly, *see* N.C. Const. art. II, §§ 1, 3, 5, the judicial branch should exercise its power to declare statutes unconstitutional with "great reluctance," *Bayard v. Singleton*, 1 N.C. (Mart.) 5, 6 (1787), "recognizing

---

[6] In its remand instructions, the majority instructs the "[three-judge panel] to oversee" the redrawing of new senatorial districts. *Harper v. Hall* (*Harper II*), 2022-NCSC-121, ¶ 114. Pursuant to N.C.G.S. § 120-2.4(a), however, the General Assembly elected in November 2022 must have the first opportunity to redraw the RSP. *See Pender County v. Bartlett*, 361 N.C. 491, 509, 649 S.E.2d 364, 376 (2007) (striking a remedial legislative plan and remanding it to the General Assembly to redraw it for a second time, noting that "[r]edistricting is a legislative responsibility, [and] N.C.G.S. §§ 120-2.3 and 120-2.4 give the General Assembly a first, limited opportunity to correct the plans that the courts have determined are flawed." (second alteration in original) (quoting *Stephenson III*, 358 N.C. at 230, 595 S.E.2d 119)).

that when it strikes down an act of the General Assembly, [it] is preventing an act of the people themselves," *State ex rel. McCrory*, 368 N.C. at 650, 781 S.E.2d at 259 (citing *Baker*, 330 N.C. at 336–37, 410 S.E.2d at 890).

¶ 164      The presumption of constitutionality, therefore, is a limiting tool of judicial review that helps the judicial branch avoid encroaching on the General Assembly's legislative authority. Where a statute is susceptible to two interpretations, one that is constitutional and one that is not, courts must adopt the former. *Wayne Cnty. Citizens Ass'n v. Wayne Cnty. Bd. of Comm'rs*, 328 N.C. 24, 29, 399 S.E.2d 311, 315 (1991). Courts will not declare a statute void unless that "conclusion is so clear that no reasonable doubt can arise, or the statute cannot be upheld on any reasonable ground." *Id.* (citing *Poor Richard's, Inc. v. Stone*, 322 N.C. 61, 63, 366 S.E.2d 697, 698 (1988)). Presuming that a statutory enactment is constitutional and resolving every doubt in favor of the statute ensures that the Court will not inadvertently prevent a lawful exercise of legislative power.

¶ 165      This exercise of judicial restraint is especially necessary to counterbalance the power of judicial review because our constitution does not enable the other branches to check our exercise of the judicial power to strike down statutes:

> The power of declaring laws unconstitutional should always be exercised with extreme caution, and every doubt resolved in favor of the statute. As has been well said, these rules are founded on the best of reasons, because, while the supreme judicial power may interfere to prevent a legislative, and other departments, from exceeding their

> powers, no tribunal has yet been devised to check the encroachments of the judicial power itself.

*Jenkins,* 180 N.C. at 170, 104 S.E.2d. at 347. Applying the presumption of constitutionality and adhering to its separation-of-powers principles, courts should presume that the General Assembly's policy decisions, made while acting pursuant to its legislative authority, are constitutional.

¶ 166    In this case, the General Assembly made various policy decisions during each step of the remedial map-drawing process, such as the decision to use Maptitude or to obtain partisan election data from the Mattingly Election Set. Accordingly, the three-judge panel should have started from the presumption that these policymaking decisions were constitutional. Then it should have reviewed the evidence to determine if, beyond a reasonable doubt, one or more of those policy decisions was arbitrary, flawed, or unreasonable so as to render at least one of the Remedial Plans unconstitutional. For example, such evidence might show that Maptitude is a defective software that vastly undercalculated the Remedial Plans' Mean-Median Difference and Efficiency Gap scores or that the Mattingly Election Set contained flawed data. If the evidence supported a determination that these policy decisions were constitutionally flawed beyond a reasonable doubt, only then could the three-judge panel have declared the affected map or maps constitutionally invalid. If the evidence did not demonstrate this sort of constitutional defect, however, it would be insufficient to overcome the presumption, and the three-judge panel would have

been required to uphold the Remedial Plans. Accordingly, we consider whether the three-judge panel's "findings of fact and conclusions of law were appropriate and adequate" in approving the RSP and RHP and rejecting the RCP. *Stephenson v. Bartlett* (*Stephenson II*), 357 N.C. 301, 309, 582 S.E.2d 247, 252 (2003).

## B. Findings of Fact and Conclusions of Law

¶ 167    In cases such as this one, in which the trial court presides over a trial without a jury, this Court's role of review is very limited. *See Bailey v. State*, 348 N.C. 130, 146, 500 S.E.2d 54, 63 (1998). In reviewing a trial court's findings of fact, "we are 'strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence.'" *State v. Williams*, 362 N.C. 628, 632, 669 S.E.2d 290, 294 (2008) (quoting *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982)). If the trial court's findings of fact are supported by competent evidence, the findings "have the force and effect of a jury verdict and are conclusive on appeal if there is competent evidence to support them." *Stephenson II*, 357 N.C. at 309, 582 S.E.2d at 252 (quoting *Bailey*, 348 N.C. at 146, 500 S.E.2d at 63). Such findings are binding on appeal even if the "evidence is conflicting," *Williams*, 362 N.C. at 632, 669 S.E.2d at 294 (quoting *State v. Smith*, 278 N.C. 36, 41, 178 S.E.2d 597, 601 (1971)), and "could be viewed as supporting a different finding," *Stephenson II*, 357 N.C. at 309, 582 S.E.2d at 252 (quoting *Bailey*, 348 N.C. at 146, 500 S.E.2d at 63); *see also Biggs v. Lassiter*, 220 N.C. 761, 770, 18 S.E.2d 419, 424 (1942) (noting that a trial

court's findings of fact are binding on appeal "unless there is no sufficient evidence to support them, or error has been committed in receiving or rejecting testimony upon which they are based, or some other question of law is raised with respect to said findings"). Where contradictory evidence exists, "the trial judge is in the best position to 'resolve the conflict.' " *Williams*, 362 N.C. at 632, 669 S.E.2d at 294 (quoting *Smith*, 278 N.C. at 41, 178 S.E.2d at 601). Likewise, the trial court determines the amount of weight given to various pieces of evidence. *In re I.K.*, 377 N.C. 417, 2021-NCSC-60, ¶ 25 ("It is the trial court's responsibility to pass upon the credibility of the witnesses and the weight to be given their testimony . . . ." (quoting *In re G.G.M.*, 377 N.C. 29, 2021-NCSC-25, ¶ 18)).

¶ 168        If we conclude that competent evidence supports the trial court's findings of fact, "we must then determine whether those findings of fact support the conclusions of law." *Stephenson II*, 357 N.C. at 309, 582 S.E.2d at 252. We review a trial court's conclusions of law de novo. *State v. Biber*, 365 N.C. 162, 168, 712 S.E.2d 874, 878 (2011).

### III.        Analysis

¶ 169        Here the majority upholds the three-judge panel's approval of the RHP but finds unconstitutional the RSP. It affirms the three-judge panel's conclusion that the RCP was unconstitutional and upholds the Modified Congressional Plan redrawn by the Special Masters. To reach these holdings, the majority briefly mentions the

appropriate standards of review but then, when necessary, circumvents those standards to reach its desired results. The majority fails to apply the presumption of constitutionality in a manner consistent with our precedent and the textual allocation of power between the branches of government. Likewise, the majority fails to consistently limit itself to considering whether the three-judge panel's underlying findings of fact are supported by competent evidence. Instead, the majority freely reweighs and distorts evidence that is essentially the same to support two conflicting results—affirmation of the RHP but reversal of the RSP. The majority strips the three-judge panel of its responsibility to assess credibility and distribute weight to the evidence and freely substitutes its own judgment regarding weight and credibility.

¶ 170    The three-judge panel relied heavily on each map's Mean-Median Difference and Efficiency Gap scores in forming its findings of fact and reaching its ultimate conclusions of law. It focused on these metrics because in *Harper I* the majority identified threshold scores for these metrics that it said could serve as safe harbors of constitutionality. *See Harper I*, 2022-NCSC-17, ¶¶ 166–67. Here there is competent evidence to support the three-judge panel's findings of fact that both the RHP and the RSP satisfy those thresholds. Nevertheless, the majority insists that the three-judge panel correctly approved the RHP but somehow incorrectly approved the RSP. The

only explanation is that the majority has shaped its analysis to ensure a predetermined outcome.

¶ 171        Additionally, the majority affirms the three-judge panel's erroneous rejection of the RCP. The three-judge panel failed to give the RCP the correct presumption of constitutionality because it did not defer to the General Assembly's policy choices to use Maptitude and the Mattingly Election Set. It then adopted the Special Masters' summary rejection of the RCP and accepted the Special Masters' Modified Congressional Map.

¶ 172        The dissent in *Harper I* forecasted the incongruent results the majority reaches today. The majority's result confirms that there is no discernable, manageable standard by which to adjudicate partisan gerrymandering claims. *See id.* ¶ 241 (Newby, C.J., dissenting). Even though the majority insists that the General Assembly's Remedial Plans must pass the *Harper I* tests to be entitled to the presumption of constitutionality, *see id.* ¶ 163 (majority opinion), it now changes the tests. Further, this analysis flips the presumption of constitutionality on its head and permits the majority to select pieces of data from four, court-appointed political scientists and evidence presented by plaintiffs to uphold the redistricting plans it finds politically favorable and reject those that it does not. As discussed in the dissent in *Harper I*, the majority disingenuously commandeered this heightened standard approach from *Stephenson I*, 355 N.C. at 383−84, 562 S.E.2d at 396−97. *See id.* ¶¶

258–59 (Newby, C.J., dissenting). In *Stephenson I*, however, this Court overcame the presumption of constitutionality by applying clear standards derived from the text of the constitution itself, rather than the ever-changing, nebulous "standards" of the majority's results-oriented approach.

**A. Remedial House Plan**

¶ 173     On remand, the General Assembly made the policy decision to use Maptitude along with partisan election data from its chosen Mattingly Election Set to draw and adjust the Remedial Plans until each fell within the Mean-Median Difference and Efficiency Gap thresholds identified by this Court in *Harper I*. The General Assembly chose to use the Mean-Median Difference and Efficiency Gap scores, as opposed to other tests, because these metrics have been peer-reviewed extensively and because scholars generally agree on the appropriate thresholds for measuring partisanship with these metrics. As measured by Maptitude, the RHP satisfied these threshold standards:

|                 | RHP   |
|-----------------|-------|
| Mean-Median     | 0.7%  |
| Efficiency Gap  | 0.84% |

¶ 174     In its order, the three-judge panel relied primarily on the reports of its Special Masters in making its findings of fact. Specifically, the Special Masters reviewed the "submissions from all of the parties as well as the reports of the advisors" and

materials from the parties' "experts." In all, this evidence included twelve submissions and briefs from the parties, seven reports and affidavits from the parties' experts, and four reports from the Special Masters' advisors, totaling 716 pages. The Special Masters also considered the "findings of the advisors on the partisan symmetry analysis, the declination metrics, and their opinions on partisan bias and evidence of partisan gerrymandering." The advisors' evidence was extensive and diverse and included an array of partisan fairness metrics, differing counts of "competitive" seats, measures of compactness, and graphic comparisons to ensemble maps. Of note, each advisor submitted a separate report. They did not submit a single collective report as indicated by the majority. "Considering all of this information as well as the totality of circumstances," the Special Masters concluded that the RHP "meets the test of presumptive constitutionality . . . under the metrics identified by the North Carolina Supreme Court."

¶ 175    In turn, the three-judge panel "adopt[ed] in full the findings of the Special Masters" and reviewed "all remedial and alternative plans . . . as well as additional documents, materials, and information pertaining to the submitted plans" in making "additional specific findings" on the Remedial Plans. First, the three-judge panel summarized the General Assembly's process for drawing and analyzing all the Remedial Plans and found that it was constitutionally compliant:

> 13.    The General Assembly's Remedial Criteria
> governing the remedial map drawing process were those

> neutral and traditional redistricting criteria adopted by the Joint Redistricting Committees on August 12, 2021 . . . unless the criteria conflicted with the Supreme Court Remedial Order and full opinion.
>
> 14. Although expressly forbidden by the previously-used August 2021 Criteria, the General Assembly as part of its Remedial Criteria intentionally used partisan election data as directed by the Supreme Court's Remedial Order. The General Assembly did so by loading such data into Maptitude, the map drawing software utilized by the General Assembly in creating districting plans . . . .
>
> 15. The Court finds that the General Assembly's use of partisan data in this manner comported with the Supreme Court Remedial Order.

The three-judge panel then addressed the RHP specifically, finding that it contained "key differences" that rendered it more competitive than the 2021 House Plan, that the General Assembly appropriately balanced incumbency protection with "traditional neutral districting criteria," that the RHP was "satisfactorily within the statistical ranges set forth in [*Harper I*]," and that any "partisan skew" remaining in the RHP was "explained by the political geography of North Carolina."

¶ 176    Based on these findings, the three-judge panel concluded that the RHP "satisfies th[is] [ ] Court's standards" in *Harper I*, and that none of the evidence presented was "sufficient to overcome th[e] presumption" that the RHP was constitutional. Accordingly, the three-judge panel approved the RHP.

¶ 177    The majority upholds the RHP by finding that competent evidence supports the relevant findings of fact which in turn support the conclusion that the RHP is constitutional. This result is correct, but the majority reaches it for the wrong reasons. In concluding that the relevant findings of fact are supported by competent evidence, the majority looks only to the evidence submitted by the Special Masters' advisors and does not even mention Legislative defendants' data or chosen remedial process. For example, the majority notes that "[t]he Special Masters' [a]dvisors determined that the RHP yields an average [E]fficiency [G]ap of about 2.88%, [and] an average [M]ean-[M]edian [D]ifference of about 1.27%,"[7] but does not acknowledge that Legislative defendants calculated an Efficiency Gap of 0.84% and a Mean-Median Difference of 0.70% using Maptitude and the Mattingly Election Set. *Harper II*, 2022-NCSC-121, ¶ 93.

¶ 178    The majority's approach is inappropriate because, as already noted, the proper starting point when reviewing an act of the General Assembly is to exercise the presumption that the General Assembly's policy choices are constitutional. This Court should presume the General Assembly's policy choices, such as the use of

_____

[7] Nowhere in *Harper I* does the majority mention using averages of Mean-Median Difference and Efficiency Gap scores to assess a map's partisan fairness. By definition, to determine an average requires giving equal weight to each score. Nevertheless, the majority now relies on these average scores in upholding the RHP, despite the fact that its calculation of the RHP's average Mean-Median Difference is significantly outside its stated parameter of 1% or less.

Maptitude or the Mattingly Election Set, were constitutional and only review the advisors' reports to see whether they rebut the presumption beyond a reasonable doubt. The majority does the opposite, however.

¶ 179          No one alleged the General Assembly's policy decisions—such as, which redistricting software and which partisan election data to use—were unconstitutional. There was no evidence to that effect in the record. Thus, by looking exclusively to the advisors' evidence and ignoring entirely Legislative defendants' evidence, the majority's analysis defers to the advisors' methods and reports and uses them to build a case that the RHP is constitutional.

¶ 180          The majority's approach is erroneous because it adopts the *advisors'* policy determinations—that is, their selected analyses—as the redistricting standard. Such an approach reverses the presumption of constitutionality because it no longer requires the evidence to demonstrate that the General Assembly's plan fails to meet an objective standard of constitutionality. Instead, it requires the General Assembly to show that some group of unspecified political scientists agree that its policy determinations meet constitutional muster. This backwards approach permits the majority to weigh the various redistricting approaches from the individual advisors as it sees fit, rather than deferring to the General Assembly's selected redistricting approach. As a result, the majority can select the evidence that supports its preferred outcome and reject the evidence that does not.

¶ 181　　　With the RHP, the majority happened to reach the correct result without giving proper deference to the legislative branch's policy choices. Following this same approach, however, enables the majority to reach a contradictory result with the RSP. A comparison of the majority's treatment of the RSP with its treatment of the RHP demonstrates the inherent flaws in the majority's approach.

### B. Remedial Senate Plan

¶ 182　　　Despite the three-judge panel's upholding of the RHP, as recommended by the Special Masters, the majority declines to give the RSP a presumption of constitutionality, applies strict scrutiny, and determines that it is unconstitutional beyond a reasonable doubt. The majority arrives at this conclusion despite the fact that the evidence regarding the RSP and the RHP is very similar. Considered together, the majority's holdings regarding the RSP and the RHP make clear that it is simply reweighing and, at times, mischaracterizing the evidence in order to reach its preferred outcome.

¶ 183　　　On remand, the General Assembly made the exact same policy choices and followed the exact same redrawing process for the RSP as it did for the RHP. It utilized Maptitude and the partisan election data from the Mattingly Election Set to draw and adjust the RSP until the RSP fell within the Mean-Median Difference and Efficiency Gap thresholds identified by this Court in *Harper I*. Just like the RHP, the RSP, as measured by Maptitude, satisfied the *Harper I* threshold standards:

|  | RSP |
|---|---|
| Mean-Median | 0.65% |
| Efficiency Gap | 3.97% |

¶ 184    Likewise, the Special Masters considered very similar evidence in assessing the RSP as they did in assessing the RHP. Notably, from their weighing of this evidence the Special Masters made almost identical findings regarding the RHP and the RSP:

## I.    Proposed Remedial House Plan

The advisors as well as the experts of the parties ("experts") all found the efficiency gap of the proposed [RHP] to be less than 7%. The majority of the advisors and experts found the mean-median difference of the proposed [RHP] to be less than 1%. In addition to these facts, the Special Masters considered the findings of the advisors on the partisan symmetry analysis, the declination metrics, and their opinions on partisan bias and evidence of partisan gerrymandering. Considering all of this information as well as the totality of circumstances, the Special Masters conclude under the metrics identified by the North Carolina Supreme Court that the proposed [RHP] meets the test of presumptive constitutionality. Further the Special Masters did not find substantial evidence to overcome the presumption of constitutionality and recommend to the [three-judge panel] that it give appropriate deference to the General Assembly and uphold the constitutionality of the [RHP].

## II.    Proposed Remedial Senate Plan

All of the advisors and experts found the efficiency gap of the proposed [RSP] to be less than 7%. The majority of the

advisors and experts found the mean-median difference of the proposed [RSP] to be less than 1%. In addition to these facts, the Special Masters considered the findings of the advisors on the partisan symmetry analysis, the declination metrics, and their opinions on partisan bias and evidence of partisan gerrymandering. Considering all of this information as well as the totality of circumstances, the Special Masters conclude under the metrics identified by the North Carolina Supreme Court [that] the [RSP] meets the test of presumptive constitutionality. Further the Special Masters did not find substantial evidence to overcome the presumption of constitutionality and recommend to the [three-judge panel] that it give appropriate deference to the General Assembly and uphold the constitutionality of the [RSP].

¶ 185    In turn, the three-judge panel adopted these findings "in full" and found that they demonstrated that the RHP and RSP "meet the requirements of [*Harper I*]." The panel also made "additional specific findings" regarding each plan. Similar to the Special Masters' findings, the three-judge panel's specific findings regarding the RSP and RHP were nearly identical:

36.    In determining the base map for the State Senate Districts, the Senate also started from scratch. The Senate altered two county groupings and adopted groupings for Senate Districts 1 and 2 that were preferred by Common Cause Plaintiffs. The remaining county groupings remained the same. As a result, the 13 wholly-contained single district county groupings in the [RSP] were kept from the [2021 Senate] Plan.

. . . .

39.    The process for the development of the Remedial Senate Plan began with separate maps being drawn by the Senate Democratic Caucus and the

Republican Redistricting and Election Committee members, respectively. The plans were then exchanged and discussed; however, after the two groups could not come to a resolution, the plan proposed by the Republican Redistricting and Election Committee members was then put to a vote by the Senate Committee and advanced to the full chamber.

40.     The [RSP] includes ten districts that were within ten points in the 2020 presidential race.

41.     The [RSP] reflects key differences from the 2021 [ ] Senate Plan in the projected partisan makeup of districts in certain county groupings.

> a. In the Cumberland-Moore County grouping, Senate District 21 is now more competitive.
>
> b. In the Iredell-Mecklenburg County grouping, one district is more competitive.
>
> c. In New Hanover County, the districts were made more competitive, resulting in a Senate District 7 that leans Democratic.
>
> d. In Wake County, Senate Districts 17 and 18 are more Democratic leaning.

42.     The Court finds, based upon the analysis performed by the Special Masters and their advisors, that the [RSP] is satisfactorily within the statistical ranges set forth in the Supreme Court's full opinion. *See Harper v. Hall*, 2022-NCSC-17, ¶ 166 ([M]ean-[M]edian [D]ifference of 1% or less) and ¶ 167 ([E]fficiency [G]ap less than 7%).

43.     The Court finds that to the extent there remains a partisan skew in the [RSP], that partisan skew is explained by the political geography of North Carolina.

. . . .

51. In determining the base map for the State House Districts, the House started from scratch after keeping only the 14 districts that were the product of single district county groupings.

. . . .

54. The [RHP] reflects key differences from the 2021 [ ] House Plan in the projected partisan makeup of districts in certain county groupings.

    a. Buncombe County, which consisted of 1 Republican and 2 Democratic districts in the [2021 House] Plan, consists of 3 Democratic districts in the [RHP].

    b. Pitt County, which consisted of 1 Republican and 1 Democratic district in the [2021 House] Plan, consists of 2 Democratic districts in the [RHP].

    c. Guilford County now consists of 6 Democratic leaning districts.

    d. Cumberland County now consists of 3 Democratic districts and 1 competitive district.

    e. Mecklenburg and Wake Counties now consist of 13 Democratic leaning districts each.

    f. New Hanover, Cabarrus, and Robeson Counties now contain an additional competitive district each.

55. The Court finds, based upon and confirmed by the analysis of the Special Masters and their advisors, that

the [RHP] [is] satisfactorily within the statistical ranges
set forth in the Supreme Court's full opinion. *See Harper v.
Hall*, 2022-NCSC-17, ¶166 ([M]ean-[M]edian [D]ifference
of 1% or less) and ¶167 ([E]fficiency [G]ap less than 7%).

56.     The Court finds that to the extent there
remains a partisan skew in the [RHP], that partisan skew
is explained by the political geography of North Carolina.

The evidence underlying the three-judge panel's findings of fact regarding the
RHP's and RSP's Mean-Median and Efficiency Gap scores was also characteristically
the same. Both sets of findings were based on "the analysis of the Special Masters
and their advisors":

| Remedial Senate Plan | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Grofman 6 election composite | McGhee Planscore | Wang 2016-2020 | Jarvis | Mattingly 16 new Election Composite | Barber General Assembly's Mattingly Election Set | Maptitude |
| Mean-Median Diff. | 0.77% | 2.2% | 0.8% | 1.4% | 1.3% | 0.65% | 0.63% |
| Efficiency Gap | 4.24% | 4.8% | 2.2% | 4.0% | 4.07% | 3.97% | 3.98% |

| Remedial House Plan | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Grofman 6 election composite | McGhee Planscore | Wang 2016-2020 | Jarvis | Mattingly 16 new Election Composite | Barber General Assembly's Mattingly Election Set | Maptitude |
| Mean-Median Diff. | 0.89% | 1.4% | 0.9% | 1.5% | 1.45% | 0.7% | 0.71% |
| Efficiency Gap | 2.72% | 3.0% | 3.1% | 2.7% | 3.23% | 0.84% | 0.84% |

For both plans, at least four advisors and experts calculated a Mean-Median Difference score of less than 1%, and all of the advisors and experts calculated an Efficiency Gap score of less than 7%.[8]

¶ 187     Given the similarities between both the three-judge panel's findings of fact regarding each plan and the evidence supporting those findings of fact, it is clear there was evidence supporting the panel's conclusion that both plans "meet th[is] [ ] Court's standards and requirements" from *Harper I*, particularly when the three-judge panel was required to presume that the General Assembly's selected approach of using Maptitude, pulling partisan election data from the Mattingly Election Set, and relying on the resulting Mean-Median Difference and Efficiency

---

[8] The appropriate standard of review is whether any evidence supports the three-judge panel's findings of fact. Here there is clearly ample evidence in the record to support the three-judge panel's findings of fact that the RHP and the RSP were "satisfactorily within the statistical ranges set forth in [*Harper I*]."

Gap scores was constitutional. As a result, the majority's decision to overturn the RSP but uphold the RHP when each is supported by comparable evidence is inconsistent and can only be explained by the majority's desire to reach a particular outcome. To accomplish this outcome, the majority reweighs and defers exclusively to select portions of the evidence that the Special Masters and three-judge panel in fulfilling its duty as the fact-finder apparently chose to discount.

¶ 188        The majority says one of the "keystones" of the three-judge panel's decision is its erroneous views of the statistical data. For example, the majority notes that "all but one [a]dvisor" concluded that the RSP scored above the 1% Mean-Median Difference threshold but ignores the fact that all the advisors found that the RSP scored below the 7% Efficiency Gap threshold. *Harper II*, 2022-NCSC-121, ¶ 99. The majority's statement that "all but one [a]dvisor" calculated a Mean-Median Difference above 1% for the RSP is not only selective, but inaccurate. Half of the advisors, not one, calculated the RSP's Mean-Median Difference score as less than 1%. This inaccuracy illustrates why appellate courts must refrain from reweighing evidence and instead must defer to the trial court's assessment of the record. *See In re I.K.*, 2021-NCSC-60, ¶ 25 ("It is the trial court's responsibility to pass upon the credibility of the witnesses and the weight to be given their testimony and the reasonable inferences to be drawn therefrom. Because the trial court is uniquely situated to make

this credibility determination appellate courts may not reweigh the underlying evidence presented at trial.").[9]

¶ 189          Nevertheless, according to the majority, this evidence undermines the three-judge panel's finding that the RSP met the statistical thresholds identified in *Harper I*. The same number of advisors, however, found that the RHP scored above the 1% Mean-Median Difference threshold as well. Inexplicably, the majority concludes that this fact weighs *against* the three-judge panel's findings of fact regarding the RSP but *supports* its findings of fact regarding the RHP.

¶ 190          In upholding the RHP, the majority states that collectively "[t]he [ ] [a]dvisors determined that the RHP yields an average [E]fficiency [G]ap of about 2.88%, [and] an average [M]ean-[M]edian [D]ifference of about 1.27%." *Harper II*, 2022-NCSC-121, ¶ 93. The advisors' average scores for the RSP are very close to those for the RHP. For the RSP, the average of the advisors' Efficiency Gap scores is 3.81% and the average of their Mean-Median Difference scores is 1.29%. The average Mean-Median Difference scores for the two plans are within two-one-hundredths of a percentage point of each other. Why does 1.27% weigh in favor of the RHP's constitutionality but 1.29% weighs against the RSP's constitutionality? If there is something critical about that difference, the majority does not explain it.

---

[9] To the extent the majority questions the work of the three-judge panel and its assessment of the evidence, the correct resolution is to remand for clarification, not for an appellate court to reweigh evidence and find its own facts.

¶ 191 The majority's use of average scores is also problematic for another reason. The advisors did not calculate the average of their Mean-Median Difference and Efficiency Gap scores. Instead, each advisor individually calculated a set of scores using his chosen redistricting software and set of elections, and then each advisor submitted his set of scores to the three-judge panel. The majority, on its own, calculates these average scores, giving each equal weight, and then relies on this new data to support its conclusion that the RHP is constitutional and the RSP is unconstitutional. The majority does this even though it never mentioned using averages of Mean-Median Difference and Efficiency Gap scores to assess a map's partisan fairness in *Harper I*.

¶ 192 In calculating its own average scores, the majority essentially reweighs the evidence to give equal weight and credibility to each of the advisors' calculations. It gives equal weight to these four sets of scores despite claiming to discount the analyses of the two advisors who engaged in forbidden ex parte communications.[10] The three-judge panel, however, should weigh the evidence, determine credibility, and find facts because it "is in the best position" to do so. *Williams*, 362 N.C. at 632, 669 S.E.2d at 294 (quoting *Smith*, 278 N.C. at 41, 178 S.E.2d at 601). In its order, the three-judge panel did not specify the weight that it gave to each of the advisors' scores, though it did incorporate the Special Masters' finding that "the analysis provided by Drs. Wang and Jarvis was helpful" but "not determinative" of any particular finding

---

[10] *See generally* footnote 4.

of fact. Accordingly, in averaging the advisors' scores and assigning each of their scores equal weight, the majority reweighs the evidence and attaches creditability to evidence that the three-judge panel and Special Masters might have discounted. The majority usurps the three-judge panel's role as fact-finder by replacing the three-judge panel's assessment of the advisors' credibility with its own.[11]

¶ 193        Similarly, the majority rejects the three-judge panel's finding of fact that any "partisan skew" remaining in the RSP is "explained by the political geography of North Carolina." *Harper II*, 2022-NCSC-121, ¶ 100. The majority rejects this finding, claiming that it "is an incomplete statement of the requirement established in *Harper* [*I*]." *Id.* The three-judge panel, however, made the exact same finding of fact regarding the RHP: "The [trial] [c]ourt finds that to the extent there remains a partisan skew in the [RHP], that partisan skew is explained by the political

---

[11] As already noted, the majority here freely disregards the appropriate standard of review and reweighs the evidence only when necessary to reach its preferred outcome. However, in another case also filed today, the same majority insists that it must defer to a trial court's findings of fact when supported by competent evidence:

> many of defendants' arguments in this case ask this Court to rewrite the trial court's findings of fact. But when the trial court conducts a trial without a jury, "the trial court's findings of fact have the force and effect of a jury verdict and are conclusive on appeal if there is competent evidence to support them, even [if] the evidence could be viewed as supporting a different findings."

*Holmes v. Moore*, 2022-NCSC-122, ¶ 83 (quoting *In re Skinner*, 370 N.C. 126, 139, 804 S.E.2d 449, 458 (2017)). Thus, it is clear that the majority understands the appropriate standard of review, but simply ignores it at will to reach its favored outcome.

geography of North Carolina." The majority, however, does not reject this identical finding of fact as an "incomplete statement" of its criteria from *Harper I*. Instead, the majority accepts this finding as "supported by competent evidence." *Id.* ¶ 93. How can this finding of fact support the conclusion that the RHP is constitutional, but weigh against the conclusion that the RSP is constitutional?[12]

¶ 194        Finally, in addition to the various errors contained in the majority's analysis listed above, the majority also gravely mischaracterizes the evidence from below. Most notably, the majority repeatedly cites from one of the advisors' reports but describes that cited data or opinion as if it were the collective conclusion of all four advisors. For example, the majority states the "[t]he [a]dvisors specifically determined that alternative remedial Senate plans often reflect 'less than half the size of the [partisan] advantage in the Legislative [d]efendants' [RSP].' " *Harper II*, 2022-NCSC-121, ¶ 100 (second and fourth alteration in original). This quote,

---

[12] Notably, the three-judge panel's finding regarding political geography was born out in the November 2022 election. While various political science tests may seek to assess the political geography of the state, nothing is more accurate in revealing the political geography than our most recent election. Six statewide Republican judicial candidates won their seats by at least 5%, each carrying at least eighty-one counties. *See* North Carolina State Board of Elections, https://er.ncsbe.gov/?election_dt=11/08/2022&county_id=0&office=JUD&contest=0 (last visited Dec. 8, 2022). Similarly, aggregating votes across the state, the Republican state senatorial candidates received 59% of the total vote share, while Republican state House candidates received over 57%. *See* North Carolina State Board of Elections, https://er.ncsbe.gov/?election_dt=11/08/2022&county_id=0&office=NCS&contest=0 (last visited Dec. 8, 2022); *see* North Carolina State Board of Elections, https://er.ncsbe.gov/?election_dt=11/08/2022&county_id=0&office=NCH&contest=0 (last visited Dec. 8, 2022).

however, is contained in only one of the advisors' reports; it is not, at least as far as the record reflects, the conclusion of all four advisors. Nevertheless, the majority describes this opinion as if it were reached by the advisors collectively.

¶ 195 The majority mischaracterizes various portions of evidence in this way throughout its opinion, essentially implying that the four advisors collectively assessed the Remedial Plans and generally agreed on every aspect of their analysis. This depiction is simply inaccurate. Each advisor individually analyzed the Remedial Plans using his own preferred metrics, election data, and calculation methods, and each reached different individual conclusions. Accordingly, the majority's rendering of the advisors' reports as a shared analysis is misleading.

¶ 196 Regardless of the various flaws in the majority's analysis, the appropriate standard of review in this case required the three-judge panel to assume that the General Assembly's methods and scores were valid and accurate unless the evidence demonstrates otherwise beyond a reasonable doubt. The General Assembly, one expert, and two of the four advisors agreed that the RSP scored below the 1% threshold for Mean-Median Difference, and the General Assembly, one expert, and all four advisors agreed that the RSP scored below the 7% threshold for Efficiency Gap. This evidence is more than competent to support the three-judge panel's finding that the RSP is "satisfactorily within the statistical ranges set forth in" *Harper I*, and it was the duty of the three-judge panel to weigh this evidence. As a result, it does

not matter that some of the advisors and experts calculated scores above the thresholds.

¶ 197 The majority is bound by the three-judge panel's findings of fact if they are supported by competent evidence, even when there is a conflict, *Williams*, 362 N.C. at 632, 669 S.E.2d at 294, and the three-judge panel could have made "a different finding," *Stephenson II*, 357 N.C. at 309, 582 S.E.2d at 252. The majority fails to employ the correct standard of review by seeking evidence that contradicts the three-judge panel's findings of fact, rather than looking for evidence that supports those findings. The majority is required to presume the General Assembly acted constitutionally absent evidence showing, beyond a reasonable doubt, that it did not.

## C. Remedial Congressional Plan

¶ 198 The General Assembly drew and scored the RCP using the exact same approach as it followed for the RHP and RSP. As with the other two maps, Maptitude measured the RCP's Mean-Median Difference and Efficiency Gap scores within the majority's thresholds:

|  | RCP |
|---|---|
| Mean-Median Difference | 0.61% |
| Efficiency Gap | 5.29% |

¶ 199 In reviewing the RCP, the three-judge panel and the Special Masters once again seemed to take the same approach. They examined the same extensive evidence from the "submissions from all of the parties as well as the reports of the advisors"

and materials from the parties' "experts." From this evidence, the Special Masters found that "there is substantial evidence from the findings of the advisors that the [RCP] has an [E]fficiency [G]ap above 7% and a [M]ean-[M]edian [D]ifference of greater than 1%," and that "[t]here is disagreement among the parties as to whether the proposed [RCP] meets the presumptively constitutional thresholds suggested by th[is] [ ] Court." However, the scores do not support this finding:

| | Remedial Congressional Plan | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Grofman 6 election composite | McGhee Planscore | Wang 2016-2020 | Wang 10 Election | Jarvis | Mattingly 16 new Election Composite | Barber General Assembly's Mattingly Election Set | Maptitude |
| Mean-Median Diff. | 0.66% | 1.1% | 0.7% | 1.2% | 0.9% | 1.01% | 0.61% | 0.61% |
| Efficiency Gap | 6.37% | 6.4% | 7.4% | 6.8% | 8.8% | 7.31% | 5.29% | 5.3% |

¶ 200 Once again, the Special Masters also considered "the advisors' findings on the partisan symmetry analysis and the declination metrics." The advisors completed the same diverse array of partisan fairness metrics, counts of "competitive" seats and compactness, and graphic comparisons to ensemble maps for the RCP as they did for the other two plans. Considering all of this evidence, the Special Masters concluded that the RCP "fails to meet the threshold of constitutionality" set forth in *Harper I* and recommended that the three-judge panel reject the RCP.

¶ 201    Given their recommendation, the Special Masters created and submitted the Modified Congressional Plan that, in their opinion, satisfied the standards from *Harper I*. In creating the Modified Congressional Plan, the Special Masters "focused" on the RCP and "worked solely" with one of the advisors, Dr. Bernard Grofman, and his assistant to amend it. Dr. Grofman created three maps for the Special Masters' consideration. The Special Masters selected one of Dr. Grofman's maps and then "modified" it "to improve the [E]fficiency [G]ap and [M]ean-[M]edian [D]ifference scores" using Dave's Redistricting App.[13]

¶ 202    The three-judge panel adopted the Special Masters' findings in full, and proceeded to make its own, additional findings regarding the RCP. First, as with the RHP and RSP, the three-judge panel approved of the General Assembly's remedial process for drawing the RCP. Then the three-judge panel noted that the RCP contained "key differences from the 2021 Congressional Plan" that made it more competitive, including the fact that "[f]our congressional districts are some of the most politically competitive in the country." Next, the three-judge panel looked to the RCP's Mean-Median Difference and Efficiency Gap scores and found, "based upon the

---

[13] Not only is the composition of this de facto redistricting commission suspect, *see generally* footnote 4, but the actual 2022 election results reflect the Democratic bias in the Modified Congressional Plan. Democrats had 47% of the statewide aggregate congressional votes but won one-half of the seats. *See* North Carolina State Board of Elections, https://er.ncsbe.gov/?election_dt=11/08/2022&county_id=0&office=FED&contest=0 (last visited Dec. 8, 2022).

analysis performed by the Special Masters and their advisors, that the [RCP] is not satisfactorily within the statistical ranges set forth in [*Harper I*]." Finally, the three-judge panel found "that the partisan skew in the [RCP] is not explained by the political geography of North Carolina." As a result, the three-judge panel found that "[t]he Special Masters' findings demonstrate that the [RCP] does not meet the requirements of th[is] [ ] Court's Remedial Order and full opinion" in *Harper I*.

¶ 203        The three-judge panel then turned to the Special Masters' Modified Congressional Plan. The three-judge panel found that the Special Masters' plan "was developed in an appropriate fashion, is consistent with N.C.G.S. § 120-2.4(a1), and is consistent with the North Carolina Constitution and th[is] [ ] Court's [*Harper I*] opinion."

¶ 204        Based on these findings, the three-judge panel concluded that the RCP "does not satisfy th[is] [ ] Court's standards" from *Harper I* and therefore, was "not presumptively constitutional." Accordingly, the three-judge panel concluded that the RCP was subject to strict scrutiny. Applying strict scrutiny, the three-judge panel concluded that "[t]he General Assembly has failed to demonstrate that their [RCP] is narrowly tailored to a compelling governmental interest," and thus, concluded that the RCP was unconstitutional. As a result, the three-judge panel concluded that the Special Masters' Modified Congressional Plan should be adopted instead.

¶ 205      Although the three-judge panel weighed the same volume and variety of evidence in reviewing the RCP as it did with the RSP and RHP, this evidence was not competent to support its findings of fact that the RCP "does not meet the requirements of [*Harper I*]" or its conclusions of law that the RCP was unconstitutional. The evidence is not competent to support a rejection of the RCP because, under the presumption of constitutionality, the standard of proof for declaring an act of the General Assembly unconstitutional is significantly higher than that for accepting that an act of the General Assembly is constitutional. To support the three-judge panel's findings of fact regarding the RCP, competent evidence would have to rebut the presumption that the General Assembly acted constitutionally beyond a reasonable doubt.

¶ 206      Overall, the three-judge panel only made two specific findings of fact that support its conclusion of law that the RCP was unconstitutional:

> 34.    The Court finds, based upon the analysis performed by the Special Masters and their advisors, that the [RCP] is not satisfactorily within the statistical ranges set forth in the Supreme Court's full opinion. *See Harper v. Hall*, 2022-NCSC-17, ¶ 166 (mean-median difference of 1% or less) and ¶ 167 (efficiency gap less than 7%).

> 35.    The Court finds that the partisan skew in the [RCP] is not explained by the political geography of North Carolina.

The only other findings of fact that were specific to the RCP were (1) that the General Assembly's remedial process and use of partisan data "comported with" this Court's

Remedial Order, and (2) that the RCP contained "key differences" that made four of its districts "some of the most politically competitive in the country." Neither of these findings supports a conclusion that the RCP is unconstitutional. Accordingly, the three-judge panel's rejection of the RCP appears to be based primarily, if not solely, on its finding that the plan did not meet the Mean-Median Difference and Efficiency Gap thresholds. In turn, the three-judge panel based this finding of fact "upon the analysis performed by the Special Masters and their advisors."

¶ 207    The Maptitude software used by the General Assembly, however, produced results which found that the RCP's Mean-Median Difference and Efficiency Gap scores were within the thresholds identified by this Court in *Harper I*, and the three-judge panel approved of the General Assembly's method for calculating those scores. The three-judge panel's order contains no finding that identifies the RCP's actual Mean-Median Difference and Efficiency Gap scores. Nor does it identify any purported flaw in the General Assembly's metrics or process that rendered its scores inaccurate as compared with those calculated by the advisors. The order summarily found that "based upon the analysis performed by the Special Masters and their advisors," the scores for the General Assembly's RCP were too high. However, as shown, the scores were consistent with those for the RHP and RSP, which were upheld by the three-judge panel. In fact the RCP's average Mean-Median Difference

score is 0.88% and its average Efficiency Gap score is 6.91%. Both are clearly within the "presumptively constitutional" ranges identified by the majority in *Harper I*.

¶ 208        Accordingly, it appears that the three-judge panel, instead of presuming that the General Assembly acted constitutionally in drawing, adjusting, and scoring the RCP, deferred to the reports of the Special Masters and the advisors. Again, such a backwards approach ignores the presumption of constitutionality altogether and defeats its purpose entirely. Even taken together, these reports do not overcome the presumption of constitutionality's high bar. None of the advisors even addressed the General Assembly's remedial process or metrics, let alone demonstrated that the legislature's decisionmaking was arbitrary, unreasonable, or otherwise constitutionally flawed. Why were Maptitude's Mean-Median Difference and Efficiency Gap scores sufficient for the RHP and the RSP, but not for the RCP?

¶ 209        Additionally, while the advisors and the experts each calculated slightly different scores, this is not surprising because each utilized different redistricting software, partisan election data, and calculation methods. For example, each of the advisors used different redistricting software from the others, and none chose to use Maptitude, as had the General Assembly. Dr. Grofman used Dave's Redistricting App to calculate the RCP's Mean-Median Difference and Efficiency Gap scores, and Dr. McGhee used a web-based redistricting software called PlanScore. It is not clear from

Dr. Grofman's or Dr. McGhee's reports how these technologies calculate the relevant metrics or whether they do so differently than Maptitude.

¶ 210    Likewise, each of the advisors used different sets of elections as their source of partisan data to measure the RCP. Once again, none chose the same set of elections as each other or as the General Assembly. Dr. Jarvis, for example, pulled partisan election data from eleven statewide elections. Nine of these matched the General Assembly's Mattingly Election Set, but two did not. Dr. Grofman used "major statewide races [in] 2016–2020," but did not specify how many election contests or which ones. Dr. Wang used a set of ten statewide elections to create his own sets of hypothetical partisan election data. Dr. Wang varied the vote totals in each of these elections "above and below an average [vote total]" in order to "evaluat[e] a range of future [vote total] scenarios that may arise in the coming decade." Dr. Wang also created a composite of vote totals by averaging together three data points: (1) the average two-party vote share of the 2016 and 2020 presidential elections; (2) the average two-party vote share of the 2016 and 2020 United States Senate elections; and (3) the average two-party vote share of the 2020 elections for Governor and Attorney General. None of the advisors stated why they preferred their selected set of elections or hypothetical elections or purported to explain why their selection should be substituted for the General Assembly's.

¶ 211 Additionally, Dr. McGhee took a very "different approach" to calculating the Mean-Median Difference and Efficiency Gap scores. Instead of analyzing which party's candidate would win in a proposed new district by using data from prior election contests, Dr. McGhee used PlanScore to "predict" potential partisan outcomes in the future. Dr. McGhee did not explain which elections PlanScore applied to predict future election results, nor did he explain the criteria used by PlanScore to make such predictions. Dr. McGhee also calculated two sets of Mean-Median Difference and Efficiency Gap scores. He calculated one set from a simulated election that assumed that no incumbents ran for reelection and another set from a simulated election that assumed that all incumbents ran for reelection in the proposed district containing their residence.

¶ 212 Accordingly, none of the advisors used the same software or followed the same methods as the General Assembly, which explains the variance among the calculated scores. Once again, we should defer to the General Assembly's policy choices, such as its decision to use Maptitude and the Mattingly Election Set over the policy choices of others. It does not matter that the advisors chose to use different software, election results, or calculation methods if that evidence does not demonstrate that the General Assembly's alternative choices were constitutionally flawed.

¶ 213 These varying results prove that the process of drawing a redistricting map involves and requires a multitude of policy choices. At each step of the process, the

General Assembly could have chosen to do something different. The General Assembly could have chosen Dave's Redistricting App or another redistricting software instead of Maptitude. Alternatively, the General Assembly might have chosen a different set of elections to supply its partisan election data. It could have pulled data from five previous elections, instead of twelve. Or, it could have used only presidential elections, instead of a variety of statewide contests.

¶ 214      But the General Assembly did not make any of these decisions. The mere existence of other possible redistricting methods does not raise a suspicion, let alone demonstrate beyond a reasonable doubt, that the General Assembly's selected approach was constitutionally inadequate in any way. If "every doubt" is to be "resolved in favor of" an act of the General Assembly, *Jenkins*, 180 N.C. at 170, 104 S.E. at 347, then the three-judge panel should have deferred to the General Assembly's policy choices and its chosen redistricting method when presented with nothing more than an array of alternative calculation methods and scores from court-appointed political scientists. Accordingly, the three-judge panel erred in rejecting the RCP, and this Court should reverse that portion of its order.

¶ 215      Nevertheless, the majority, like the three-judge panel, defers to the report of the Special Masters and ignores the presumption of constitutionality entirely. The majority flips the presumption of constitutionality on its head by deferring to the policy choices of four court-appointed political scientists to invalidate the policy

choices of the people's chosen representatives. For example, in affirming the three-judge panel's rejection of the RCP, the majority notes that none of the advisors found that the RCP "yielded both an [E]fficiency [G]ap below 7% and a [M]ean-[M]edian [D]ifference below 1%." *Harper II*, 2022-NCSC-121, ¶ 83. The majority does not recognize, however, that the General Assembly's Maptitude software measured the RCP's Efficiency Gap as 5.29% and its Mean-Median Difference as 0.61%, both well below the thresholds identified by this Court in *Harper I*. The majority simply defers to the advisors' findings on the RCP's Mean-Median Difference and Efficiency Gap scores without explaining how the advisors' analysis shows that the General Assembly's calculation of these scores was constitutionally flawed. Nor does the majority create its own averages for the RCP as it did the RHP and RSP. If it had it would see that both scores for the RCP are within the "presumptively constitutional" ranges identified in *Harper I*. The RCP has an average Mean-Median Difference of 0.88% and an average Efficiency Gap of 6.91%.

¶ 216        In doing so, the majority usurps the role of the General Assembly—the policymaking branch of government—by replacing the General Assembly's discretionary redistricting decisions with its own preferred redistricting approaches. More broadly, however, the majority eliminates the presumption of constitutionality entirely and inserts the judiciary squarely into future policy decisions that rightfully belong to the General Assembly. Under the majority's analytical framework, it

appears that any act of the General Assembly may be declared unconstitutional so long as there is at least one scientist, scholar, specialist, or expert willing to opine that the statute fails under at least one political science-based metric. As a result, the majority has wrenched political power from the people and vested it entirely in its own hands.

¶ 217     This Court's decision from more than a century ago in *Jenkins v. State Board of Elections*, 180 N.C. 169, 104 S.E. 346 (1920), illustrates the significance of the separation-of-powers principles and the strength of the presumption of constitutionality. In that case the General Assembly exercised its legislative authority to amend the State's election laws to allow absentee voting. Specifically, the General Assembly enacted the Absentee Voters Law, which permitted any registered voter who was "absent from the county in which" he was registered, *id.* at 172, 104 S.E. at 348, to vote using mail-in ballot forms provided by the State Board of Elections, Compl. 7, *Jenkins*, 180 N.C. 169 (No. 260). J.J. Jenkins, who was running for the Office of State Treasurer, Pl.'s Br. 1, *Jenkins*, 180 N.C. 169 (No. 260), filed suit challenging the Absentee Voters Law as a violation of Article VI of the state constitution and sought to enjoin the State Board of Elections from implementing the statute in the 1920 general election, *id.* at 7, 8.

¶ 218     The plaintiff primarily argued that the Absentee Voters Law conflicted with Article VI, Section 2 of the North Carolina Constitution. *See id.* at 2–29. At the time,

Article VI, Section 2 of the North Carolina Constitution required that, to qualify to vote in a particular county or district, a person must have "resided . . . in the precinct, ward or other election district, in which he offers [to] vote, four months next preceding the election." N.C. Const. of 1868, art. VI, § 2. The plaintiff contended that this provision not only required voters to reside in their respective county or district for the requisite period of time but also prohibited voters from submitting a ballot unless they were physically present in their county or district of residence. *See* Pl.'s Br. at 11−13.

¶ 219      Before this Court, the plaintiff made several arguments to support this contention. For example, he argued that the verb "offer" in Article VI, Section 2 referred to a voter's act of submitting a ballot, not the local board of elections' act of accepting and counting a ballot. *Id.* at 13. Accordingly, the act of submitting the ballot had to occur in the voter's county of residence and could not be completed by mailing a ballot from another location. *Id.* The plaintiff also analogized the phrase "offers to vote" to an offer to form a contract, which is "complete the moment [it] passes out of the hands of the [offeree]." *Id.* at 14. Thus, like a contract offer, the plaintiff argued that a voter's "offer[ ] to vote" was complete the moment he submitted it for acceptance by his local board of elections. *Id.* at 17. Thus, according to the plaintiff, the voter could only submit his ballot by hand in the county in which he resided. *Id.* Lastly, the plaintiff also compared Article VI, Section 2 to similar provisions in other

state constitutions that were held to prohibit absentee voting laws. *Id.* at 18−19. Accordingly, the plaintiff concluded that the Absentee Voters Law violated Article VI, Section 2 by permitting voters to "offer to vote" from locations outside their county or district of residence.

¶ 220          In answering this question, this Court first explained that the well-settled presumption of constitutionality applied. *Jenkins*, 180 N.C. at 170, 104 S.E. at 347 ("No rule of construction is better settled, both upon principle and authority, than that legislative enactments are presumed to be constitutional until the contrary is shown. It is only when they plainly conflict with some provision of the [c]onstitution that they should be declared void."). The Court then noted that the plaintiff raised a compelling argument that Article VI, Section 2 required a voter to "offer[ ] to vote" while physically present in his county or district of residence. *Id.* at 172, 104 S.E. at 348. The Court admitted that, as a result, there was some doubt regarding the constitutionality of the Absentee Voters Law. *Id.* ("[W]e must admit that the question is perplexing and involved in doubt."). Regardless, the Court determined that raising a compelling argument of unconstitutionality was insufficient to overcome the presumption of constitutionality's high bar. *Id.* at 172−73, 104 S.E. at 348. Accordingly, this Court concluded that it was, therefore, required to uphold the statute:

> [W]e think the language of the [c]onstitution is susceptible
> of a fair interpretation which will sustain the statute, in

> which case it is our duty to uphold it and give to the law
> the benefit of the doubt. The party who undertakes to
> pronounce a law unconstitutional takes upon himself the
> burden of proving beyond any reasonable doubt that it is
> so. Nothing should have the effect of avoiding a statute
> duly enacted but a *direct* collision between its provisions
> and the [c]onstitution. That collision is not so clear as to
> justify us in setting aside a statute, which is the law in a
> majority of the States of the Union, and, so far as we can
> find, has not been contested in recent years.

*Id.*

Thus, the presumption of constitutionality imposes a high bar to surmount and can only be overcome if it is clear beyond a reasonable doubt that the relevant enactment directly conflicts with an express provision of the constitution. *See Baker*, 330 N.C. at 334−37, 410 S.E.2d at 889−90. As applied to this case, plaintiffs have not shown that the General Assembly's Remedial Plans, presumed constitutional, violate the constitution beyond a reasonable doubt.

## IV.      Political Question

The dissenting opinion in *Harper I* explained in great detail that partisan gerrymandering claims present nonjusticiable political questions because the North Carolina Constitution textually assigns the issue of redistricting to the legislature and because there is no judicially discernible, manageable standard by which courts may adjudicate such claims. *See Harper I*, 2022-NCSC-17, ¶¶ 237−67 (Newby, C.J., dissenting). The exact justiciability pitfalls forecasted by the dissenting opinion in *Harper I* permeated the proceedings on remand, and they are present again in the

majority's decision today. Accordingly, revisiting the political question analysis from *Harper I* is warranted.

¶ 223 "The Supreme Court of the United States has explained that 'as essentially a function of the separation of powers,' courts must refuse to review issues that are better suited for the political branches." *Id.* ¶ 237 (quoting *Baker*, 369 U.S. at 217, 82 S. Ct. at 710). Such matters are nonjusticiable, political questions. One characteristic of a political question is the absence of a standard that is judicially discoverable and manageable. *Id.*

¶ 224 As explained in the dissent in *Harper I*, the Supreme Court of the United States recently provided detailed guidance regarding the nonjusticiability of partisan gerrymandering claims in *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019). *See Harper I*, 2022-NCSC-17, ¶¶ 238–45. In *Rucho* the Supreme Court determined that claims of excessive partisanship—brought by a group of Maryland and North Carolina voters regarding their states' congressional maps—were nonjusticiable. 139 S. Ct. at 2491.

¶ 225 The Court first noted that "[p]artisan gerrymandering claims have proved far more difficult to adjudicate" than other types of redistricting issues because "while it is illegal for a jurisdiction to depart from the one-person, one-vote rule, or to engage in racial discrimination in districting, 'a jurisdiction may engage in constitutional political gerrymandering.'" *Id.* at 2497 (quoting *Hunt v. Cromartie*, 526 U.S. 541, 551,

119 S. Ct. 1545, 1551 (1999)). Because some level of partisan gerrymandering is constitutional, "[t]he 'central problem' " with such claims is " 'determining when political gerrymandering has gone too far,' " *id.* (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 296, 124 S. Ct. 1769, 1787 (2004) (plurality opinion)), and "providing a standard for deciding how much partisan dominance is too much," *id.* (quoting *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 420, 126 S. Ct. 2594, 2611 (2006) (opinion of Kennedy, J.). Because of this inherent difficulty, the Supreme Court stressed that if there exists a standard for resolving such claims, it "must be grounded in a 'limited and precise rationale,' be 'clear, manageable, and politically neutral,' " *id.* at 2498 (quoting *Vieth*, 541 U.S. at 306–08, 124 S. Ct. at 1793 (Kennedy, J., concurring in the judgment)), and "reliably differentiate unconstitutional from 'constitutional political gerrymandering,' " *id.* at 2499 (quoting *Cromartie*, 526 U.S. at 551, 119 S. Ct. at 1551).

¶ 226   The Supreme Court then examined whether it could find such a standard in the Federal Constitution. The Court explained that partisan gerrymandering claims are effectively requests for courts to allocate political power to achieve proportional representation, something the Federal Constitution does not require. *Id.* ("Our cases, however, clearly foreclose any claim that the Constitution requires proportional representation . . . ." (quoting *Davis v. Bandemer*, 478 U.S. 109, 130, 106 S. Ct. 2797, 2809 (1986) (plurality opinion))). Accordingly, partisan gerrymandering claims do not

seek to redress a violation of any particular constitutional provision; rather, such claims "ask the courts to make *their own political judgment* about how much representation particular political parties *deserve*—based on the votes of their supporters" and "to apportion political power as a matter of fairness." *Id.* (first emphasis added). This judgment call is not the kind of "clear, manageable, and politically neutral" standard required for justiciable issues. *Id.* at 2498 (quoting *Vieth*, 541 U.S. at 306−08, 124 S. Ct. at 1793 (Kennedy, J., concurring in the judgment)); *see also id.* at 291, 124 S. Ct. at 1784 (plurality opinion) (" 'Fairness' does not seem to us a judicially manageable standard. . . . Some criterion more solid and more demonstrably met than that seems to us necessary to enable the state legislatures to discern the limits of their districting discretion, to meaningfully constrain the discretion of the courts, and to win public acceptance for the courts' intrusion into a process that is the very foundation of democratic decisionmaking.").

¶ 227        The Court also concluded that, unlike one-person, one-vote claims, the Federal Constitution was devoid of any objective, mathematical metric for measuring "political fairness": "[T]he one-person, one-vote rule is relatively easy to administer as a matter of math. The same cannot be said of partisan gerrymandering claims, because the Constitution supplies no objective measure for assessing whether a districting map treats a political party fairly." *Rucho*, 139 S. Ct. at 2501.

¶ 228     Finding no appropriate standard in the Federal Constitution, the Supreme

Court then turned to the political science-based tests proposed by the *Rucho*

plaintiffs. *Id.* at 2503−04. These tests proved insufficient as well:

> The appellees assure us that "the persistence of a party's advantage may be shown through sensitivity testing: probing how a plan would perform under other plausible electoral conditions." Experience proves that accurately predicting electoral outcomes is not so simple, either because the plans are based on flawed assumptions about voter preferences and behavior or because demographics and priorities change over time. . . .
>
> Even the most sophisticated districting maps cannot reliably account for some of the reasons voters prefer one candidate over another, or why their preferences may change. Voters elect individual candidates in individual districts, and their selections depend on the issues that matter to them, the quality of the candidates, the tone of the candidates' campaigns, the performance of an incumbent, national events or local issues that drive voter turnout, and other considerations. Many voters split their tickets. Others never register with a political party, and vote for candidates from both major parties at different points during their lifetimes. For all of those reasons, asking judges to predict how a particular districting map will perform in future elections risks basing constitutional holdings on unstable ground outside judicial expertise.

*Id.* (citations omitted). In conclusion, the Supreme Court held that partisan

gerrymandering claims are nonjusticiable because there is "no plausible grant of

authority in the Constitution, and no legal standards to limit and direct their

decisions." *Id.* at 2507.

¶ 229     Today's decision further illustrates the wisdom of that Court's observations. According to the majority, the General Assembly and six jurists were unable to understand and apply the criteria set forth by the majority in *Harper I*. If, as the majority insists, the "test" from *Harper I* "provide[s] a clear standard" so that the General Assembly can "reliably" identify and avoid political gerrymandering, *Harper I*, 2022-NCSC-17, ¶ 310 (quoting *Rucho*, 139 S. Ct. at 2499), then why did the General Assembly, the three-judge panel, and the Special Masters all fail to discern and apply that standard on remand? The fact that they could not properly understand and apply the criteria discussed in *Harper I* is prima facie evidence that the majority's standard is unworkable. The majority even concedes that its standard from *Harper I* is "imperfect" and "vulnerable to manipulation," *Harper II*, 2022-NCSC-121, ¶¶ 78, 77, yet it continues to insist its standard must be applied.

¶ 230     Additionally, the majority's holding today renders the applicable "standard" going forward even less manageable than the standard it iterated in *Harper I*. In *Harper I* the majority suggested "possible bright-line standards" from "political science literature." *Harper I*, 2022-NCSC-17, ¶ 165 (majority opinion). It specifically opined that "any plan with a [M]ean-[M]edian [D]ifference of 1% or less when analyzed using a representative sample of past elections is presumptively constitutional." *Id.* ¶ 166. Similarly, it concluded that a "seven percent [E]fficiency [G]ap threshold" was presumptively constitutional. *Id.* ¶ 167. Now the majority backs

away from any possible bright-line standard and basically removes any presumption by stating that even these threshold scores that it identified cannot reliably identify a constitutional redistricting plan:

> Constitutional compliance has no magic number. Rather, the trial court may consider certain datapoints within its wider consideration of the ultimate legal conclusion: whether the plan upholds the fundamental right of the people to vote on equal terms and to substantially equal voting power.

*Harper II*, 2022-NCSC-121, ¶ 76. How the General Assembly, constitutionally tasked with the redistricting responsibility, or a three-judge panel can recognize whether a redistricting plan meets this criteria, however, the majority does not say.

## V. Conclusion

¶ 231    When is a legislative redistricting plan constitutional? Only four justices on this Court know, and they refuse to say why the plans at issue today are unconstitutional. Why are they reluctant to say?

¶ 232    Ambiguity leads to redistricting by the judiciary, which appears to be the goal. Legislative defendants' redistricting decisions and their Remedial Plans are entitled to our historic deference. The majority gives the General Assembly none.

¶ 233    The majority admits its standard is "imperfect," *Harper II*, 2022-NCSC-121, ¶ 78, but argues it can be applied by a three-judge panel. Absent from its discussion is the branch that is constitutionally assigned redistricting responsibilities—the

legislative branch. The majority ignores the primary role of the General Assembly in seeking to interpret and apply the vague "standard" it discusses.

¶ 234        Properly analyzed under the correct standard of review, all three of the General Assembly's Remedial Plans should be approved. The RCP and the RSP meet the criteria of presumptive constitutionality set forth in *Harper I*. Most telling, the majority strikes down the RSP when the three Special Masters and the three-judge panel all agreed that it was constitutionally compliant under *Harper I*. Apparently, six jurists and the General Assembly were unable to discern and apply the correct constitutional test or recognize a constitutional redistricting plan. Once again, only four justices know what redistricting plan will meet their view of constitutionality. I respectfully dissent.

Justices BERGER and BARRINGER join in this dissenting opinion.